# EXHIBIT A

Trials@uspto.gov                                              Paper 11
571-272-7822                                      Date: March 17, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

UNIFIED PATENTS, LLC,
Petitioner,

v.

DIVX, LLC,
Patent Owner.

———————————

IPR2021-01476
Patent 10,326,987 B2

———————————

Before BART A. GERSTENBLITH, MONICA S. ULLAGADDI, and
IFTIKHAR AHMED, *Administrative Patent Judges*.

AHMED, *Administrative Patent Judge*.

DECISION
Granting Institution of *Inter Partes* Review
*35 U.S.C. § 314*

IPR2021-01476
Patent 10,326,987 B2

## I.   INTRODUCTION

Unified Patents, LLC ("Petitioner") requested an *inter partes* review of claims 1 and 10 (the "challenged claims") of U.S. Patent 10,326,987 B2 (Ex. 1001, "the '987 patent").  Paper 1 ("Petition" or "Pet.").  DivX, LLC ("Patent Owner") filed a Preliminary Response.  Paper 7 ("Prelim. Resp.").

Under 35 U.S.C. § 314(a), an *inter partes* review may not be instituted unless it is determined that there is a reasonable likelihood that the petitioner would prevail with respect to *at least one* of the claims challenged in the petition.  Based on the information presented in the Petition and the supporting evidence, we are persuaded that there is a reasonable likelihood that Petitioner would prevail with respect to at least one of the challenged claims.  Accordingly, we institute an *inter partes* review of the challenged claims on the grounds set forth in the Petition.

Our factual findings and conclusions at this stage of the proceeding are based on the evidentiary record developed thus far.  This is not a final decision as to patentability of the challenged claims.  Any final decision will be based on the full trial record, including any response to the Petition timely filed by Patent Owner.

## II.   BACKGROUND

### A.   Related Proceedings

The parties indicate that the '987 patent is asserted in *DivX, LLC v. Hulu, LLC*, Case 2:21-cv-01615 (C.D. Cal.).  Pet. 1; Paper 4, 1.

### B.   The '987 Patent (Ex. 1001)

The '987 patent, titled "Systems and Methods for Encoding Alternative Streams of Video for Use in Adaptive Bitrate Streaming," was filed on March 8, 2017, and claims priority through two continuation

IPR2021-01476
Patent 10,326,987 B2

applications to a provisional application filed on January 6, 2011.  Ex. 1001, codes (22), (54), (60), (63).

The '987 patent "generally relates to adaptive bitrate streaming and more specifically to the buffering of media by playback devices in adaptive bitrate streaming systems."  *Id.* at 1:22–24.  Figure 4 is reproduced below.



Figure 4 is "a flow chart illustrating a process for switching between streams when the amount of media buffered before commencement of playback is determined using the upper bound seek delay."  *Id.* at 4:22–26.  After starting playback, the playback device "measures (104) the channel data rate

3

IPR2021-01476
Patent 10,326,987 B2

and determines (106) whether there has been a change in channel rate.  If there has been a change, the playback device chooses (102) the stream that is optimally encoded for the new channel rate.  The process repeats until the end of the stream (108) is reached."  *Id.* at 10:52–57.

## C.  *Challenged Claims*

Petitioner challenges claims 1 and 10, both of which are independent claims.  Claim 1 is reproduced below, with Petitioner's identifiers.

[1.0] A playback device for playing content from a plurality of alternative streams, the playback device comprising:

[1.1] a set of one or more processors; and

[1.2] a non-volatile storage containing an application for causing the set of one or more processors to perform steps of:

[1.3] obtaining a top level index file identifying a plurality of alternative video streams and specifying a maximum bitrate for each of the plurality of alternative video streams, where the plurality of alternative video streams comprises a first and a second alternative video stream and the specified maximum bitrate of the second alternative video stream is higher than the specified maximum bitrate of the first alternative video stream;

[1.4] during an initial startup period:

[1.4.1] obtaining at least one network data rate measurement;

[1.4.2] selecting the first alternative video stream based upon a comparison between the specified maximum bitrates for each of the plurality of streams and the at least one network data rate measurement;

[1.4.3] requesting at least one chunk of the first alternative video stream;

[1.4.4] storing the at least one chunk of the first alternative video stream in a buffer of the playback device; and

[1.4.5] playing back at least one chunk of the first alternative stream stored in the buffer;

[1.4.6] obtaining at least one additional network data rate measurement;

[1.4.7] determining that the network data rate is greater than the specified maximum bitrate for the second alternative video

IPR2021-01476
Patent 10,326,987 B2

stream based upon the at least one additional network data rate measurement;

[1.4.8] when the network data rate is determined to be greater than the specified maximum bitrate for the second alternative video stream, requesting at least one chunk of the second alternative video stream;

[1.5.1] when a minimum buffer level criterion is satisfied based upon a playback duration of chunks of video content stored in the buffer of the playback device:

[1.5.2] obtaining at least one further network data rate measurement;

[1.5.3] selecting a stream from the plurality of alternative video streams based upon a playback duration of chunks of video content stored in the buffer of the playback device by selecting a stream from the plurality of alternative video streams such that the playback duration of chunks of video content stored in the buffer of the playback device is sufficient to prevent buffer underflow during downloading and playback of at least one chunk of the selected video stream based upon the at least one further network data rate measurement;

[1.5.4] requesting at least one chunk of the selected stream from the plurality of alternative video streams;

[1.5.5] storing the at least one chunk of the selected stream from the plurality of alternative video streams in the buffer of the playback device; and

[1.5.6] playing back the at least one chunk of the selected stream from the plurality of alternative video streams stored in the buffer.

Ex. 1001, 14:56–15:54 (Petitioner's annotations from Pet. 14–38).

IPR2021-01476
Patent 10,326,987 B2

### D. The Asserted Grounds

Petitioner asserts that claims 1 and 10 would have been unpatentable on the following grounds:

| Claim(s) Challenged | 35 U.S.C. §[1] | Reference(s)/Basis |
|---|---|---|
| 1, 10 | 103(a) | Biderman[2], Gigliotti[3] |
| 1, 10 | 103(a) | Sood[4], Myers[5], Casalena[6], Nilsson[7], Ma[8] |

## III. ANALYSIS

### A. Principles of Law

"In an [*inter partes* review], the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable." *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016) (citing 35 U.S.C. § 312(a)(3) (requiring *inter partes* review petitions to identify "with particularity . . . the evidence that supports the

---

[1] Because the challenged claims of the '987 patent have an effective filing before March 16, 2013, patentability is governed by the pre-AIA version of 35 U.S.C. § 103.

[2] WIPO Patent Application No. WO 2010/078281 A2, published July 8, 2010 (Ex. 1019, "Biderman").

[3] U.S. Patent Application No. 2009/0307367 Al, published December 10, 2009 (Ex. 1020, "Gigliotti").

[4] U.S. Patent Application No. 2010/0235472 Al, published September 16, 2010 (Ex. 1005, "Sood").

[5] U.S. Patent No. 8,190,677 B2, issued May 29, 2012 (Ex. 1016, "Myers").

[6] U.S. Patent No. 9,324,375 B1, issued April 26, 2016 (Ex. 1006, "Casalena").

[7] U.S. Patent Application No. 2009/0116551 Al, published May 7, 2009 (Ex. 1007, "Nilsson").

[8] WIPO Patent Application No. WO 2010/111261 Al, published September 30, 2010 (Ex. 1008, "Ma").

IPR2021-01476
Patent 10,326,987 B2

grounds for the challenge to each claim")). *See Dynamic Drinkware, LLC v.
Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015) (discussing the
burden of proof in *inter partes* review).

As set forth in 35 U.S.C. § 103(a),

[a] patent may not be obtained . . . if the differences between the
subject matter sought to be patented and the prior art are such
that the subject matter as a whole would have been obvious at the
time the invention was made to a person having ordinary skill in
the art to which said subject matter pertains.

The question of obviousness is resolved on the basis of underlying
factual determinations including: (1) the scope and content of the prior art;
(2) any differences between the claimed subject matter and the prior art;
(3) the level of ordinary skill in the art; and (4) when in evidence, objective
evidence of nonobviousness. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18
(1966). An obviousness analysis "need not seek out precise teachings
directed to the specific subject matter of the challenged claim, for a court
can take account of the inferences and creative steps that a person of
ordinary skill in the art would employ." *KSR Int'l Co. v. Teleflex Inc.*,
550 U.S. 398, 418 (2007); *accord In re Translogic Tech., Inc.*, 504 F.3d
1249, 1259 (Fed. Cir. 2007). However, Petitioner cannot satisfy its burden
of proving obviousness by employing "mere conclusory statements." *In re
Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1380 (Fed. Cir. 2016).
Instead, Petitioner must articulate a reason why a person of ordinary skill in
the art would have combined the prior art references. *In re NuVasive*,
842 F.3d 1376, 1382 (Fed. Cir. 2016).

Petitioner asserts that either Biderman in combination with Gigliotti,
or Sood in combination with Myers, Casalena, Nilsson, and Ma, would have
rendered the subject matter of claims 1 and 10 of the '987 patent obvious to

IPR2021-01476
Patent 10,326,987 B2

one of ordinary skill in the art at the time of the invention.  Pet. 10–75.  We analyze the asserted grounds of unpatentability in accordance with these principles to determine whether Petitioner has met its burden to establish a reasonable likelihood of prevailing in establishing unpatentability of the challenged claims at trial.

### B.   Level of Ordinary Skill in the Art

We review Petitioner's asserted obviousness grounds in view of the understanding of a person of ordinary skill in the art at the time of the invention.  *Graham*, 383 U.S. at 17.  Petitioner contends that a person of ordinary skill in the art "would have had a bachelor's degree in electrical or computer engineering, or a closely related scientific field such as computer science, and two years of work experience with streaming media applications or related fields (e.g., network applications)," where a "lack of experience can be remedied with additional education (e.g., a Master's degree), and likewise, a lack of education can be remedied with additional work experience (e.g., 4-5 years)."  Pet. 8 (citing Ex. 1003 ¶¶ 47–51).  Patent Owner does not dispute Petitioner's definition for a person of ordinary skill in the art.  *See generally* Prelim. Resp.

We determine, on the current record, that the level of ordinary skill proposed by Petitioner is consistent with the '987 patent and the asserted prior art.  *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001); *In re GPAC Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995); *In re Oelrich*, 579 F.2d 86, 91 (CCPA 1978).  We adopt that level in deciding whether to institute trial.

IPR2021-01476
Patent 10,326,987 B2

### C. Claim Construction

In this *inter partes* review, claims are construed using the same claim
construction standard that would be used to construe the claims in a civil
action under 35 U.S.C. § 282(b). *See* 37 C.F.R. § 42.100(b) (2021). The
claim construction standard includes construing claims in accordance with
the ordinary and customary meaning of such claims as understood by one of
ordinary skill in the art at the time of the invention. *See id.*; *Phillips v. AWH
Corp.*, 415 F.3d 1303, 1312–14 (Fed. Cir. 2005) (en banc). In construing
claims in accordance with their ordinary and customary meaning, we take
into account the specification and prosecution history. *Phillips*, 415 F.3d at
1315–17. Additionally, only terms that are in controversy need to be
construed, and these need be construed only to the extent necessary to
resolve the controversy. *See Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*,
200 F.3d 795, 803 (Fed. Cir. 1999) (holding that "only those terms need be
construed that are in controversy, and only to the extent necessary to resolve
the controversy"); *Nidec Motor Corp. v. Zhongshan Broad Ocean Motor
Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) (citing *Vivid Techs.* in the context
of an *inter partes* review).

Neither party contends that any claim term requires express
construction. Pet. 10; *see generally* Prelim. Resp. Accordingly, we do not
expressly construe any claim terms at this stage of the proceeding.

### D. Overview of the Asserted Prior Art

#### 1. Biderman (Ex. 1019)

Biderman is titled "Real-time or Near Real-time Streaming," and
describes a method and system "for real-time or near real-time streaming of
content using transfer protocols such as an HTTP compliant protocol."

IPR2021-01476
Patent 10,326,987 B2

Ex. 1019, codes (54), (57).  Biderman's "method includes dividing a stream of data, representing the contiguous time-based content of a program (e.g., a live video broadcast), into a plurality of distinct media files, and generating a playlist file having a plurality of tags and Universal Resource Indicators (URIs) indicating an order of presentation of the plurality of distinct media files." *Id.* at code (57).

Figure 3B of Biderman is reproduced below.



Fig. 3B

Figure 3B is a flow diagram showing selecting a bit rate, retrieving media based on the bitrate, determining whether to change the bit rate based on monitored bandwidth, and optionally changing the bit rate. *Id.* ¶¶ 113–18.

10

IPR2021-01476
Patent 10,326,987 B2

### 2.   Gigliotti (Ex. 1020)

Gigliotti is titled "Client Side Stream Switching," and is directed to enabling "substantially uninterrupted transmission of a highest compatible bit rate of a stream of media to a client via a network connection."  Ex. 1020, codes (54), (57).  The client includes one or more buffers for receiving the stream of media, and monitors buffer activity as well as bandwidth of the network connection to determine whether to transition from one bit rate to another, and when necessary, makes the transition without an interruption of the stream of media.  *Id.* at code (57).

Figure 3 is reproduced below.



IPR2021-01476
Patent 10,326,987 B2

Figure 3 is a flow chart of the process of monitoring bandwidth and selecting a bit rate. *Id.* ¶ 35. The host may stream media at a first bit rate to fill an initial buffer residing on the client (304), the stream of media is outputted to the user (306), and the host may then stream media to fill a larger client buffer (308). *Id.* ¶¶ 36–39. The host may periodically calculate the bandwidth using a system bandwidth check in addition to measuring the buffer fill rate (310) and determine whether to increase the bit rate (312). *Id.* ¶¶ 40–41. The host may also determine the status of the buffer fill level (314) and if the buffer fill level is relatively low, the process may preemptively decrease the bit rate (316). *Id.* ¶ 41.

### 3. *Sood (Ex. 1005)*

Sood is titled "Smooth, Stateless Client Media Streaming," and relates to an "adaptive streaming system . . . that provides a stateless connection between the client and server for streaming media playback in which the data is formatted in a manner that allows the client to make decisions and react more quickly to changing network conditions." Ex. 1005, codes (54), (57).

IPR2021-01476
Patent 10,326,987 B2

Figure 3 of Sood is reproduced below.



Figure 3 is a flow diagram of Sood's adaptive streaming process showing selecting an initial media encoding (step 310), requesting and playing a particular chunk of the media (step 320), determining a quality of service metric based on the requested chunk (step 330), determining of the quality of service is too low (step 340), and if the quality of service metric is too low, selecting a different encoding of the media by requesting data from a different uniform resource locator (URL) for subsequent chunks from the server (step 350).  *Id.* ¶¶ 32–33.

IPR2021-01476
Patent 10,326,987 B2

### 4.  *Myers (Ex. 1016)*

Myers is titled "Methods and Systems for Scalable Video Delivery,"
and relates to "streaming of scalable media, such as video and audio."
Ex. 1016, code (54), 1:6–8.  Myers describes streaming media files created
with layers of differing quality.  *Id.* at 1:59–60.  "The layer with the lowest
quality, referred to as the base layer, contains the most important part of the
video stream."  *Id.* at 1:60–62.  "One or more enhancement layers may then
be encoded to further refine the quality of the base layer.  The enhancement
layers are used for improving the spatial resolution (picture size), temporal
resolution (frame rate), and the SNR (signal to noise ratio) quality of the
base layer."  *Id.* at 1:62–67.  Myers uses a manifest file to facilitate
translation of client requests into particular media files and fragments, and
the manifest file contains an index entry indicating the media source file
corresponding to each bitrate and the bitrate value itself.  *Id.* at 8:13–26.

### 5.  *Casalena (Ex. 1006)*

Casalena is titled "Dynamically Adjusting Stream Quality Level," and
relates to "playing a first stream [of media content] having a first quality
level of the media content, determining that a different available quality
level of the media content would result in improved playback performance,
and switching to playing a second stream having a second quality level of
the media content."  Ex. 1006, codes (54), (57).

14

IPR2021-01476
Patent 10,326,987 B2

Figure 2 is reproduced below.



Figure 2 is a flow chart of Casalena's process for switching between different quality level streams. *Id.* at 1:37–38. A stream having the requested quality level is received from the server and played back at the client (206), and then the process determines whether improved playback

15

IPR2021-01476
Patent 10,326,987 B2

performance can be achieved with a different available quality level stream
(208). *Id.* at 3:45–48. If a determination is made that an improved playback
performance can be achieved with a different quality level stream, then the
system requests and receives from the server the same content streamed at a
different quality level (210). *Id.* at 4:4–7.

### 6. *Nilsson (Ex. 1007)*

Nilsson is titled "Data Streaming System and Method," and "relates to
a system and method suitable for streaming audio and video content over IP
(Internet Protocol) networks." Ex. 1007, code (54), ¶ 3. Nilsson describes
streaming one of several different streams of data to a client, where each
stream is encoded at a different resolution, and transmit a different stream if
"predetermined criteria are detected from the first buffer." *Id.* ¶ 19.

Figure 1 is reproduced below.



Figure 1

Figure 1 is a schematic of Nilsson's system showing transmitting server 10,
with packet transmitter 100, transmit (first) buffer 120, network 110, receive
buffer 130, and client 60. *Id.* ¶¶ 65, 68, 109.

16

IPR2021-01476
Patent 10,326,987 B2

*7. Ma (Ex. 1008)*

Ma is titled "Method and System for Efficient Streaming Video
Dynamic Rate Adaptation," and "includes a file format compatible with
legacy HTTP infrastructure to deliver media over a persistent connection,"
and "the ability for legacy client media players to dynamically change the
encoded delivery rate of the media over a persistent connection."  Ex. 1008,
codes (54), (57).

Figure 2 is reproduced below.



Figure 2 is a block diagram of one embodiment described in Ma and shows
media server 110 and client device 102, which includes media downloader
104 and media buffer 106.  *Id.* at 12:21–22, 14:5–30.  Downloader 104
interacts with server 110 to retrieve data required by data source 118.  *Id.* at
14:5–7.  The downloader uses a rate map index file "to access only the rate
map index data required, preventing the retrieval of unnecessary data."  *Id.*
at 14:11–16.

17

IPR2021-01476
Patent 10,326,987 B2

### E. Obviousness over Biderman and Gigliotti

Petitioner contends that claims 1 and 10 are unpatentable under 35 U.S.C. § 103 as obvious over Biderman and Gigliotti. Pet. 10–39. For the reasons that follow, we are persuaded that the evidence, including Dr. Reddy's testimony, sufficiently supports Petitioner's arguments and therefore establishes a reasonable likelihood that Petitioner will prevail with respect to this ground at this stage of the proceeding.

### 1. Independent Claim 1

#### a) "A playback device for playing content from a plurality of alternative streams, the playback device comprising: a set of one or more processors; and a non-volatile storage containing an application for causing the set of one or more processors to perform steps of:"

Petitioner contends Biderman teaches the preamble of claim 1 because Biderman discloses a client device that can receive a "variant playlist which refers to or otherwise specifies [] alternative streams" and can download and play media files based on the playlist. Pet. 14 (alteration in original) (citing Ex. 1019 ¶¶ 10, 11, 37; Ex. 1003 ¶¶ 65–67). Petitioner contends that Biderman's electronic system includes processor 810. *Id.* (citing Ex. 1019 ¶¶ 152–153; Ex. 1003 ¶¶ 68–70). Petitioner further contends that Biderman's system includes dynamic storage device 820 which stores information and instructions that may be executed by processor 810. *Id.* at 15 (citing Ex. 1019 ¶ 153, claims 40, 61; Ex. 1003 ¶ 71).

Patent Owner does not specifically respond to these arguments. *See generally* Prelim. Resp. Based on our review and consideration of the current record, we determine that the information presented sufficiently

IPR2021-01476
Patent 10,326,987 B2

supports Petitioner's assertion that Biderman teaches the preamble of claim 1.[9]

> b) *"obtaining a top level index file identifying a plurality of alternative video streams and specifying a maximum bitrate for each of the plurality of alternative video streams, where the plurality of alternative video streams comprises a first and a second alternative video stream and the specified maximum bitrate of the second alternative video stream is higher than the specified maximum bitrate of the first alternative video stream;"*

Petitioner contends Biderman teaches this limitation because Biderman discloses that its client device obtains a playlist file from the server, that indexer 135 creates the playlist file based on segmented media files, and that a person of ordinary skill in the art would have understood the playlist file to be an index file. Pet. 16–19 (citing Ex. 1019 ¶¶ 42, 48, 114–115; Ex. 1003 ¶¶ 74–75). Petitioner contends that Biderman's playlist file indexes encoded streams and "may include multiple EXT-X-STREAM-INF URIs with the same PROGRAM-ID to describe variant streams of the same presentation," and "the EXT-X-STREAM-INF tag includes attribute/value information, where the 'attribute BANDWIDTH=<n> is an approximate *upper bound of the stream bit rate* expressed as a number of bits per second.'" *Id.* at 17–18 (citing Ex. 1019 ¶¶ 37, 64, 136; Ex. 1003 ¶¶ 76–79).

Petitioner further contends that Biderman also teaches that the plurality of alternative video streams comprise a first and a second alternative video stream and the specified maximum bitrate of the second alternative video stream is higher than the specified maximum bitrate of the

---

[9] At this stage of the proceeding, we need not decide whether the preamble of claim 1 is limiting because, even if limiting, Petitioner has established sufficiently that the preamble is taught by Biderman.

IPR2021-01476
Patent 10,326,987 B2

first alternative video stream.  *Id.* at 19 (citing Ex. 1019, claim 28; Ex. 1003 ¶¶ 73–82).

Patent Owner does not specifically respond to these contentions.  *See generally* Prelim. Resp.  Based on our review of the current record, we determine that the information presented supports sufficiently Petitioner's assertion that Biderman teaches this limitation.

> c)   *"during an initial startup period: obtaining at least one network data rate measurement; selecting the first alternative video stream based upon a comparison between the specified maximum bitrates for each of the plurality of streams and the at least one network data rate measurement; requesting at least one chunk of the first alternative video stream; storing the at least one chunk of the first alternative video stream in a buffer of the playback device; and playing back at least one chunk of the first alternative stream stored in the buffer;"*

Petitioner contends Biderman teaches these limitations because it discloses a technique for a client device to support streaming of content using multiple bit rates and describes an initial step of requesting a playlist file and performing the claimed additional steps.  Pet. 19–24 (citing Ex. 1019 ¶¶ 113–115, 139).  Petitioner contends Biderman's client device selects the bit rate to be used based upon current network connection speeds and media files are requested accordingly.  *Id.* at 20–21 (citing Ex. 1019 ¶¶ 11, 115, 139; Ex. 1003 ¶¶ 85–89, 92).  According to Petitioner, "media files can be portions of the original stream with approximately equal duration," and Biderman refers to them as "segments," which according to Petitioner, a person of ordinary skill in the art would have understood to be the same as "chunks."  *Id.* at 22 (citing Ex. 1019 ¶¶ 70–71; Exs. 1017, 1018).  Petitioner contends that Biderman discloses that the requested media files can be stored in the client device memory, and discloses that the client

IPR2021-01476
Patent 10,326,987 B2

device memory acts as a buffer to store the media files as they are received. *Id.* at 23 (citing Ex. 1019 ¶¶ 44, 115; Ex. 1003 ¶¶ 99–100). Petitioner further contends that Biderman's client device buffer "can provide many seconds worth of presentable content beyond the time of content currently being presented so that the buffered content can later be displayed while new content is being downloaded," and that a person of ordinary skill in the art would have recognized this as teaching the playing back limitation. *Id.* at 23–24 (citing Ex. 1019 ¶¶ 44, 102, 104, 115; Ex. 1003 ¶¶ 101–103).

Patent Owner does not specifically respond to these contentions. *See generally* Prelim. Resp. Based on our review of the current record, we determine that the information presented supports sufficiently Petitioner's assertion that Biderman teaches these limitations.

> d) *"obtaining at least one additional network data rate measurement; determining that the network data rate is greater than the specified maximum bitrate for the second alternative video stream based upon the at least one additional network data rate measurement;"*

Petitioner contends Biderman teaches these limitations because it discloses that after the steps of retrieving media files and providing output, "the client device determines whether to change the bit rate," and that "[w]hile playing the media, the client device *can monitor available bandwidth* (e.g., current *network connection bit rates*) to determine whether the available bandwidth can support use of a higher bit rate for playback." Pet. 24–25 (citing Ex. 1019 ¶¶ 115, 116, 139, Fig. 3B). Petitioner further contends that given the discrete bandwidths of the variant streams in Biderman (e.g., 128000, 256000, 768000), a person of ordinary skill in the art "would have recognized that the most common way to 'determine whether *the available bandwidth can support use of a higher bit rate* for

IPR2021-01476
Patent 10,326,987 B2

playback' would be to compare the bandwidth measurement (e.g., 500000 bps) against the variant streams' bandwidths and determine whether the bandwidth measurement exceeded (i.e., *is greater than*) any of the variant streams' bandwidth." *Id.* at 25–27 (citing Ex. 1019 ¶ 139, claim 60; Ex. 1003 ¶¶ 109–111; Ex. 1009, 5).

Patent Owner contends that the Petition is unclear on whether these and other claim limitations must be performed "during an initial startup period" given the numbering employed by Petitioner for these limitations. Prelim. Resp. 4–9 (noting that Petitioner numbers "during an initial startup period" as limitation [1.4] and "obtaining at least one additional network data rate measurement" as limitation [1.4.6], which Patent Owner contends demonstrates Petitioner's position as to how these limitations should be construed). Patent Owner contends that Petitioner, however, "seems to argue that limitation [1.4.6] is not performed 'during an initial startup period'—but is instead performed 'after the initial startup period.'" *Id.* at 7–8 (citing Pet. 24–25). Patent Owner argues that Petitioner's shifting positions on how the "during an initial startup period" limitations are to be construed fail to set forth with particularity Petitioner's assertions of unpatentability.

We disagree. Regardless of Petitioner's numbering scheme, Petitioner provides detailed analysis of how the asserted prior art teaches every limitation numbered [1.4]– [1.4.8]. *See* Pet. 19–28; *see supra* II.C (listing Petitioner's numbering of claim limitations). Patent Owner does not take a position on how the "during an initial startup period" limitations are to be construed. Nor does Patent Owner contest, at this stage, Petitioner's contentions that Biderman teaches each of these claim limitations. *See generally* Prelim. Resp. We are therefore not persuaded that Petitioner's

IPR2021-01476
Patent 10,326,987 B2

contentions lack particularity or are so confusing that we cannot make a proper adjudication at this stage.  Based on our review of the current record, we determine that the information presented supports sufficiently Petitioner's assertion that Biderman teaches these limitations.

> e)   *"when the network data rate is determined to be greater than the specified maximum bitrate for the second alternative video stream, requesting at least one chunk of the second alternative video stream;"*

Petitioner contends that Biderman teaches this limitation because Biderman's "client device can . . . determine whether the available bandwidth can support use of a higher bit rate for playback.  If so, the client device can select a higher bit rate and access the media files indicated by the higher bit rate media playlist file."  Pet. 27–28 (citing Ex. 1019 ¶¶ 116, 139, Fig. 3B; Ex. 1003 ¶¶ 115–118).

Patent Owner does not specifically respond to this contention.  *See generally* Prelim. Resp.  Based on our review of the current record, we determine that the information presented supports sufficiently Petitioner's assertion that Biderman teaches this limitation.

IPR2021-01476
Patent 10,326,987 B2

> f)   *"when a minimum buffer level criterion is satisfied based upon
> a playback duration of chunks of video content stored in the
> buffer of the playback device: obtaining at least one further
> network data rate measurement; selecting a stream from the
> plurality of alternative video streams based upon a playback
> duration of chunks of video content stored in the buffer of the
> playback device by selecting a stream from the plurality of
> alternative video streams such that the playback duration of
> chunks of video content stored in the buffer of the playback
> device is sufficient to prevent buffer underflow during
> downloading and playback of at least one chunk of the selected
> video stream based upon the at least one further network data
> rate measurement;"*

Petitioner contends that the combination of Biderman and Gigliotti

teaches these limitations.  Petitioner contends that Biderman describes

repeatedly obtaining the available bandwidth metric and discloses the use of

buffering, but Biderman does not explicitly disclose a buffer level criterion,

which Petitioner contends Gigliotti teaches.  Pet. 28, 33 (citing Ex. 1019,

claim 60; Ex. 1003 ¶¶ 128–133).  Petitioner contends that Gigliotti describes

a process of "monitoring bandwidth and selecting a bit rate," streaming

media at a first bit rate to fill an initial buffer and a larger buffer, and after

filling those buffers and ensuring the buffers are sufficiently full, switching

to another stream based on a determination of excess bandwidth capacity.

*Id.* at 28–30 (citing Ex. 1020, ¶¶ 35, 36, 39, Fig. 3).  Petitioner further

contends that the buffer fill level in Gigliotti is measured in time, and

therefore, a minimum buffer level criterion is satisfied based upon whether

the level of video data in Gigliotti's client's buffer, as measured in time,

meets a threshold.  *Id.* (citing Ex. 1020, Fig. 2).  Petitioner also contends that

if the measured bandwidth in Gigliotti supports an available higher bit rate

stream of media, Gigliotti's process determines whether to increase the bit

rate of the stream.  *Id.* at 33 (citing Ex. 1020 ¶ 41).  Petitioner contends that

IPR2021-01476
Patent 10,326,987 B2

if the buffer fill level is relatively low, Gigliotti's process may preemptively
decide to decrease the bit rate. *Id.* at 33–34 (citing Ex. 1020 ¶ 42, Fig. 3).
According to Petitioner, Gigliotti discloses heuristics module 120 that may
select the most appropriate available bit rate for the stream to provide
substantially uninterrupted streaming of media to the user while maintaining
the highest quality of media. *Id.* at 34–35 (citing Ex. 1020 ¶¶ 21–22, 43–44,
Fig. 3). Petitioner contends that Gigliotti's heuristics module determines
whether to begin streaming a reduced bit rate stream if the buffer fill level
"drops below the watermark" or the "buffer's fill level is likely to reach zero
bytes," both of which correspond to a buffer underflow condition, thus
ensuring a sufficient amount of data is downloaded. *Id.* at 35–36 (citing
Ex. 1020, claim 1; Ex. 1003 ¶¶ 134–142).

Patent Owner responds that Gigliotti's "selecting a stream" occurs
when Gigliotti's "minimum buffer level criterion" is *not* satisfied, and thus,
Gigliotti "teaches the opposite of what is claimed." Prelim. Resp. 10.
According to Patent Owner, Gigliotti teaches that its determination to begin
streaming a reduced bit rate stream only occurs when the buffer level falls
below a "watermark," i.e., when Gigliotti's buffers are not filled. *Id.* at 11
(citing Pet. 35). Patent Owner contends that Gigliotti's switch to a reduced
bit rate stream when the buffer's fill level is likely to reach zero bytes also
occurs after the buffer fill level drops *below* the watermark. *Id.* at 12–14
(citing Pet. 35; Ex. 1020 ¶¶ 42, 56, 77, Fig. 6; Ex. 2001 ¶ 28). Patent Owner
asserts that Petitioner cites no teaching in Gigliotti of determining whether
the buffer is likely to reach zero when the buffer fill level is above the
watermark, and Gigliotti's stream selection only occurs when the buffer
level is below the watermark. *Id.* at 15–19 (citing Pet. 30, 33–36; Ex. 2001
¶ 30; Ex. 1020 ¶¶ 55–56, Fig. 6).

25

IPR2021-01476
Patent 10,326,987 B2

Next, Patent Owner argues that Petitioner fails to explain how Gigliotti teaches selecting a stream such that the playback duration in the buffer is sufficient to prevent buffer underflow during downloading and playback of the selected stream.  Prelim. Resp. 22–25 (citing Pet. 33–34). According to Patent Owner, Petitioner's analysis fails to take into account the claimed "playback duration . . . in the buffer," which requires consideration of the amount of content in the buffer when selecting to which stream to switch.  *Id.* at 23–24 (citing Pet. 36; Ex. 2001 ¶ 43).  Rather, Patent Owner argues, Petitioner contends only that Gigliotti prevents buffer underflow by selecting a stream at a lower bitrate, thus ensuring a sufficient amount of data is downloaded.  *Id.* at 25 (citing Pet. 35).

We find Petitioner's arguments and evidence persuasive for the purposes of institution.  Petitioner contends, under a subsection titled with limitation [1.5.1], that, in Gigliotti, media is streamed "at a first bit rate to fill an initial buffer residing on the client 104," and this "*initial buffer may include a predetermined capacity based on time* . . . for the first stream of media." Pet. 29 (citing Ex. 1020 ¶¶ 35–36).  Petitioner further contends that Gigliotti's "host 102 may stream media at the first bit rate to fill a larger buffer residing on the client 104." *Id.* (citing Ex. 1020 ¶ 39).  Petitioner relies on *either or both* of these buffers to argue that Gigliotti teaches "a minimum buffer level criterion is satisfied based upon a playback duration of chunks of video content stored in the buffer of the playback device." *Id.* at 30.

Contrary to Patent Owner's characterization of Petitioner's argument, Petitioner does not rely on Gigliotti's determination of whether a buffer's fill level drops below the watermark as teaching this limitation.  Nor does Patent Owner or its expert dispute Gigliotti's disclosure relating to the initial filing

IPR2021-01476
Patent 10,326,987 B2

of both its buffers.  Figure 3 of Gigliotti makes it amply clear that Gigliotti's process fills both buffers *before* checking bandwidth and making any determinations as to increasing or decreasing bit rate.  Ex. 1020, Fig. 3, ¶¶ 35–39.

As for limitation [1.5.3], Petitioner relies on Gigliotti's determination of "a status of the buffer fill level" as teaching "*selecting* a stream from the plurality of alternative video streams *based upon* a playback duration of chunks of video content stored in the buffer of the playback device," *not* as teaching whether "a minimum buffer level criterion is satisfied."  Pet. 33–36.  Patent Owner's argument confuses Petitioner's contentions as to the two different claim limitations and is therefore misplaced.  Petitioner plainly contends that Gigliotti's process decides to decrease the bit rate, i.e., *selects a stream* from the plurality of alternative streams based on the status of the buffer fill level, i.e., *based upon* a playback duration of chunks of video content stored in the buffer of the playback device.  *Id.*

We also disagree with Patent Owner's argument that Petitioner's analysis fails to consider the claimed playback duration in the buffer.  Prelim. Resp. 22–25.  Gigliotti explains that its heuristics module may select the most appropriate available bit rate for the stream to provide uninterrupted or substantially uninterrupted streaming of media to the user.  *See* Ex. 1020 ¶ 44; Pet. 35–36.  That selection is based on the heuristics module's "statistical analysis of the buffer's activity to determine if the buffer's fill level is likely to reach zero bytes."  Ex. 1020 ¶ 42.

> For example, the client may take periodic samples such as consecutive snapshots of the buffer's fill level after the buffer fill level drops below the watermark.  Continuous periodic samples *that indicate a decline in the buffer fill level* may initiate the host 102 *to begin streaming a reduced bit rate stream* to the

27

IPR2021-01476
Patent 10,326,987 B2

> client 104. However, if the statistical analysis determines the buffer fill level will not run empty, the bit rate may remain unchanged and the process 300 may continue streaming at the first bit rate, such as at the operation 306.

*Id.*; Pet. 33–36. On this record, we are persuaded that Gigliotti teaches consideration of the amount of content in the buffer when selecting to which stream to switch.

Based on our review of the current record, we determine that the information presented supports sufficiently Petitioner's assertion that the combination of Biderman and Gigliotti teaches these limitations.

> g) *"requesting at least one chunk of the selected stream from the plurality of alternative video streams;"*

Petitioner contends that the combination of Biderman and Gigliotti teaches this limitation because Gigliotti discloses that once the reduced bit rate stream is selected, the client plays the new stream of media, and because Gigliotti discloses that a "buffer may include two to five seconds" of a stream and that its client obtains at least one chunk of the selected stream. Pet. 36–38 (citing Ex. 1020 ¶¶ 26, 36, 43; Ex. 1003 ¶¶ 143–148).

Patent Owner does not specifically respond to this contention. *See generally* Prelim. Resp. Based on our review of the current record, we determine that the information presented supports sufficiently Petitioner's assertion that the combination of Biderman and Gigliotti teaches this limitation.

> h) *"storing the at least one chunk of the selected stream from the plurality of alternative video streams in the buffer of the playback device;"*

Petitioner contends that the combination of Biderman and Gigliotti teaches this limitation because Biderman teaches storing chunks of the first

IPR2021-01476
Patent 10,326,987 B2

alternative video stream in a buffer and Gigliotti teaches filling an initial buffer with the newly-selected stream.  Pet. 38 (citing Ex. 1019 ¶¶ 11, 44; Ex. 1020 ¶ 43; Ex. 1003 ¶¶ 149–152).

Patent Owner does not specifically respond to this contention.  *See generally* Prelim. Resp.  Based on our review of the current record, we determine that the information presented supports sufficiently Petitioner's assertion that the combination of Biderman and Gigliotti teaches this limitation.

> i)   *"playing back the at least one chunk of the selected stream from the plurality of alternative video streams stored in the buffer;"*

Petitioner contends that the combination of Biderman and Gigliotti teaches this limitation because Biderman teaches playing back the chunk from the buffer and Gigliotti discloses that its client "plays the new stream of media having the new bit rate once the initial buffer is full."  Pet. 38–39 (citing Ex. 1020 ¶ 45; Ex. 1003 ¶¶ 153–155).

Patent Owner does not specifically respond to this contention.  *See generally* Prelim. Resp.  Based on our review of the current record, we determine that the information presented supports sufficiently Petitioner's assertion that the combination of Biderman and Gigliotti teaches this limitation.

> j)   *Motivation to combine Biderman and Gigliotti*

Petitioner contends that an ordinarily skilled artisan would have been motivated to combine the teachings of Biderman and Gigliotti.  Pet. 30–32. Specifically, Petitioner contends that a person of ordinary skill in the art would have been motivated to combine Biderman's teachings of switching from one stream to another with Gigliotti's teachings of ensuring the buffer

IPR2021-01476
Patent 10,326,987 B2

is sufficiently full before switching streams because Gigliotti provides an explicit teaching to ensure "an uninterrupted or substantially uninterrupted stream of media." *Id.* at 31 (citing Ex. 1020 ¶ 13). According to Petitioner, a person of ordinary skill in the art would have recognized that Gigliotti's techniques would have improved aspects of Biderman because "without a technique for measuring the amount of content in the buffer, Biderman's client might switch to the second playlist content without sufficient content stored in the buffer, which might result in an interrupted stream of media, contrary to its goals." *Id.* at 31–32 (citing Ex. 1020 ¶ 13; Ex. 1003 ¶¶ 122–125). Petitioner argues that a person of ordinary skill in the art would have reasonably expected success in the combination because measuring buffer capacity and using buffer capacity measurements to determine when to switch between stream variants was well-known by the time of the '987 patent, and combining the teachings of Gigliotti and Biderman would have been no more than the use of a known technique to improve a similar device or method. *Id.* at 32 (citing Ex. 1003 ¶ 126; Ex. 1009, 5).

Patent Owner responds that Petitioner's reason to combine Biderman with Gigliotti fails because Biderman already teaches streaming without substantial interruptions. Prelim. Resp. 27–30 (citing Pet. 31–32; Ex. 1019 ¶ 140). Patent Owner argues that Petitioner provides no evidence to support the combination reducing or eliminating stream interruptions or that the combination would perform any better than Biderman alone with regards to providing an uninterrupted stream. *Id.* at 28–29 (citing Ex. 2001 ¶ 53).

Patent Owner also argues that Petitioner does not explain why a person of ordinary skill in the art would have been motivated to add Gigliotti's heuristics module or its functionality to Biderman, or why there would have been a reasonable likelihood of success in doing so. Prelim.

30

IPR2021-01476
Patent 10,326,987 B2

Resp. 30–32 (citing Pet. 35).  Patent Owner argues that Petitioner never contends that its rationale to combine the references applies to Gigliotti's teachings of a heuristics module or selecting a reduced bitrate stream when the buffer level drops below a watermark.  *Id.* at 31–32.

At this stage of the proceeding, Petitioner sufficiently shows that an ordinarily skilled artisan would have had reason to combine the teachings of Biderman and Gigliotti.  Pet. 30–33.  Patent Owner's arguments misconstrue Petitioner's contentions regarding the benefits of the combination. Petitioner contends that

> Biderman describes that its technique "allows the client device to switch between the versions of the program without a substantial interruption of the  program" *at a transition point* by storing content in a buffer, but a [person of ordinary skill in the art] would have recognized that, without a technique for measuring the amount of content in the buffer, Biderman's client might switch to the second playlist content *without sufficient content stored* in the buffer, which might result in an interrupted stream of media, contrary to its goals.

Pet. 31–32 (citing Ex. 1019 ¶ 140) (emphasis added).  Petitioner acknowledges that Biderman teaches the transition without a substantial interruption, but argues Biderman does not account for sufficient *second* playlist content stored in the buffer.  Petitioner's claimed motivation is different than just avoiding substantial interruptions during streaming, i.e., Petitioner's claimed improvement from Gigliotti's technique relates to interruption that may come later, after the transition to the *second* playlist. According to Petitioner, Gigliotti's technique of measuring buffer fill levels before switching occurs ensures an uninterrupted or substantially uninterrupted stream of media, thereby improving Biderman's client device and system.  *Id.* at 32 (citing Ex. 1020 ¶ 13; Ex. 1003 ¶¶ 122–125).

IPR2021-01476
Patent 10,326,987 B2

As discussed above, we determine, on the current record, that Gigliotti's selection of the most appropriate available bit rate for the stream to provide uninterrupted streaming is based on Gigliotti's heuristics module's statistical analysis of the buffer's activity and the buffer's fill level. *See supra* § III.E.1.f; Ex. 1020 ¶ 42. Accordingly, on the current record, we are persuaded that Petitioner's motivation to combine Gigliotti's technique is based on adding Gigliotti's heuristics module functionality to Biderman. *See* Pet. 32. Petitioner's contention that there would be a reasonable likelihood of success in doing so is supported by Dr. Reddy's testimony. Ex. 1003 ¶¶ 125–126 (citing Ex. 1009, 5).

For purposes of deciding whether to institute trial, we determine Petitioner provides an adequate reason why one of ordinary skill in the art would have combined the teachings of Biderman and Gigliotti in the manner asserted by Petitioner, with a reasonable expectation of success. Pet. 30–32.

### k)   Conclusion as to claim 1

On the record before us, based on the arguments and evidence above and considering the level of ordinary skill in the art, Petitioner has shown a reasonable likelihood that the combination of Biderman and Gigliotti renders obvious the subject matter of independent claim 1.

### 2.   Independent Claim 10

Independent claim 10 is similar to claim 1 as it is a method claim that recites similar functional limitations to those recited in claim 1. Ex. 1001, 16:60–17:50. Petitioner contends that claim 10 is rendered obvious by Biderman and Gigliotti for the same reasons as claim 1. Pet. 10–39. Patent Owner does not present separate arguments for claim 10. *See* Prelim. Resp. 9–32 (arguing both challenged independent claims together). For the

IPR2021-01476
Patent 10,326,987 B2

reasons discussed above with regard to claim 1, we determine that Petitioner
has established a reasonable likelihood that it would prevail in showing that
the combination of Biderman and Gigliotti would have rendered the subject
matter of claim 10 obvious to one of ordinary skill in the art at the time of
the invention.

F.  *Obviousness over Sood, Myers, Casalena, Nilsson, and Ma*

Petitioner contends that claims 1 and 10 are unpatentable under
35 U.S.C. § 103 as obvious over Sood, Myers, Casalena, Nilsson, and Ma.
Pet. 33–67.  Patent Owner presents several arguments asserting that
Petitioner has not met its burden to show a reasonable likelihood that the
challenged claims are obvious over the combination of Sood, Myers,
Casalena, Nilsson, and Ma.  Prelim. Resp. 33–67.  We have reviewed
Petitioner's challenge and Patent Owner's arguments.  Because we have
determined above that the information presented in the Petition and
Preliminary Response shows that there is a reasonable likelihood that
Petitioner will prevail with respect to at least one of the claims challenged
based on Biderman and Gigliotti, we need not address Petitioner's additional
challenge based on Sood, Myers, Casalena, Nilsson, and Ma at this stage of
the proceeding.  *See* 35 U.S.C. § 314(a).  Nonetheless, we provide below
preliminary observations regarding Petitioner's challenge and Patent
Owner's Preliminary Response to help guide the parties during the ensuing
trial.

Patent Owner argues that Petitioner fails to explain why a person of
ordinary skill in the art would have been motivated to add Myers's peak
bitrate to the Sood-Casalena-Nilsson-Ma combination.  Prelim. Resp. 33–36.
Petitioner's rationale to combine the teachings of Sood and Myers is

IPR2021-01476
Patent 10,326,987 B2

supported by Dr. Reddy's testimony that one of ordinary skill in the art would have been motivated to combine Myers's teachings of specific details with Sood's manifest file based on explicit indications in the references themselves, i.e., Sood discusses "the smooth streaming system using Microsoft Windows," and Myers likewise describes Microsoft Smooth Streaming as an "exemplary adaptive video chunking implementation," and Myers provides additional details about the manifest that would have been understood to be present in Sood.  Ex. 1003 ¶ 197 (citing Ex. 1005 ¶ 29; Ex. 1016, 1:45–46).  Myers expressly discloses detailed manifest information, including various bitrate *options* for expressing quality level, explaining that "[t]he bitrate may generally be an average bitrate, although a minimum or peak bitrate may also be specified."  Ex. 1016, 5:4–6.  Thus, on the current record, Petitioner's combination of Sood and Myers for teaching limitation [1.3] does not appear deficient.  Similarly, Petitioner's reliance on Casalena and Myers as teaching limitation [1.4.2] seems reasonable.  *See* Pet. 57–59; Prelim. Resp. 36–36.

Next, on the current record, it appears that Petitioner does rely on Ma's "rate predictive scheme" for selecting a stream as teaching limitation [1.5.3], but Ma's algorithm "calculates a variable 'predicted_occupancy,' which is a variable measured in seconds (playback duration) that is based in part on a variable 'buffer_occupancy,' defined as the 'seconds of video *currently* in the buffer.'"  Pet. 69–73 (citing Ex. 1008, 18) (emphasis added); Prelim. Resp. 39–46.

Also, on the current record, Sood's system does not appear to be limited to livestreaming, and therefore, does not appear to teach away from a combination with Nilsson.  *See* Ex. 1005, code (57) ("The adaptive

34

IPR2021-01476
Patent 10,326,987 B2

streaming system requests portions of a media file *or* of a live streaming event." (emphasis added)); Prelim. Resp. 46–52 (citing Ex. 1005 ¶¶ 4–6).

## IV. CONCLUSION

After considering the evidence and arguments presented in the Petition and Preliminary Response, we determine that the information presented shows a reasonable likelihood that Petitioner would prevail in establishing that the challenged claims of the '987 patent are unpatentable on at least one of the grounds asserted in the Petition. Thus, we institute an *inter partes* review as set forth in the Order below. Trial shall commence on the entry date of this Decision.

## V. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that, pursuant to 35 U.S.C. § 314(a), an *inter partes* review of the '987 patent is hereby instituted on the challenge to claims 1 and 10 under 35 U.S.C. § 103 as unpatentable over Biderman and Gigliotti;

ORDERED that, pursuant to 35 U.S.C. § 314(a), an *inter partes* review of the '987 patent is hereby instituted on the challenge to claims 1 and 10 under 35 U.S.C. § 103 as unpatentable over Sood, Myers, Casalena, Nilsson, and Ma; and

FURTHER ORDERED that pursuant to 35 U.S.C. § 314(c) and 37 C.F.R. § 42.4, notice is hereby given of the institution of a trial commencing on the entry date of this Decision.

IPR2021-01476
Patent 10,326,987 B2

FOR PETITIONER:

Raghav Bajaj
David L. McCombs
Jonathan R. Bowser
HAYNES AND BOONE, LLP
raghav.bajaj.ipr@haynesboone.com
david.mccombs.ipr@haynesboone.com
jon.bowser.ipr@haynesboone.com


Roshan Mansinghani
Jung S. Hahm
UNIFIED PATENTS, LLC
roshan@unifiedpatents.com
jung@unifiedpatents.com


PATENT OWNER:

Kenneth Weatherwax
Flavio Rose
Edward Hsieh
Parham Hendifar
LOWENSTEIN & WEATHERWAX LLP
weatherwax@lowensteinweatherwax.com
rose@lowensteinweatherwax.com
hsieh@lowensteinweatherwax.com
hendifar@lowensteinweatherwax.com