# Exhibit 1

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

NETFLIX, INC. AND HULU, LLC,
Petitioner,

v.

DIVX, LLC,
Patent Owner.
_____

Case IPR2020-00614
Patent 7,295,673
_____

**PATENT OWNER DIVX, LLC'S
NOTICE OF APPEAL**


via PTAB E2E
Patent Trial and Appeal Board

via Priority Mail Express
Director
Office of the General Counsel
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, Virginia 22313-1450

via CM/ECF
United States Court of Appeals for the Federal Circuit

Pursuant to 35 U.S.C. §§ 141(c), 142, and 319, 37 C.F.R. §§ 90.2(a) and 90.3(a), Rule 4(a) of the Federal Rules of Appellate Procedure, and 28 U.S.C. § 1295(a)(4)(A), Patent Owner DivX, LLC hereby appeals to the United States Court of Appeals for the Federal Circuit from the Final Written Decision (Paper 68, Attachment A) entered December 15, 2021 by the Patent Trial and Appeal Board.  In particular, Patent Owner identifies the following issues on appeal:

(i)     The Board's judgment that claims 1-6, 9, 10, and 13-19 of the '673 Patent are unpatentable, including any underlying questions of law or fact;

(ii)    Any Board finding, determination, judgment, or order supporting or related to the Final Written Decision and decided adversely to Patent Owner.

Patent Owner is concurrently filing true and correct copies of this Notice of Appeal, along with the required fees, with the United States Court of Appeals for the Federal Circuit, and with the Patent Trial and Appeal Board.

Respectfully submitted,

/ Kenneth J. Weatherwax /

Kenneth J. Weatherwax, Reg. No. 54,528
LOWENSTEIN & WEATHERWAX LLP
*Counsel for Patent Owner*

Date:  February 16, 2022

1

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the following document was served by electronic service, by agreement between the parties, on the date signed below:

### **PATENT OWNER DIVX, LLC'S NOTICE OF APPEAL**

The names and address of the parties being served are as follows:

| | |
|---|---|
| Harper Batts | HBatts@sheppardmullin.com, |
| Chris Ponder | CPonder@sheppardmullin.com |
| Jeffrey Liang | JLiang@sheppardmullin.com |
| | LegalTm-DivX-IPR@sheppardmullin.com |

Respectfully submitted,

/ Keith Moore /

_____

Date:  February 16, 2022

## <u>CERTIFICATE OF FILING WITH USPTO</u>

The undersigned hereby certifies that, pursuant to 37 C.F.R. § 90.2(a), two copies of the following document were filed by Priority Mail Express or equivalent service with the Director of the United States Patent and Trademark Office via the Office of the General Counsel, United States Patent and Trademark Office, P.O. Box 1450, Alexandria, Virginia 22313-1450, on the date signed below:

### PATENT OWNER DIVX, LLC'S
### NOTICE OF APPEAL

Respectfully submitted,

/ Keith Moore /
_____

Date:  February 16, 2022

## <u>CERTIFICATE OF FILING WITH COURT OF APPEALS</u>

The undersigned hereby certifies that, pursuant to 37 C.F.R. § 90.2, Fed. R. App. Proc. 15(a)(1), Fed. Cir. R. 15(a)(1) & 52, and Manual of Patent Examining Procedure 1216.01, the following document was electronically filed in Portable Document Format (PDF) with the United States Court of Appeals for the Federal Circuit, via electronic CM/ECF, and a paper copy was sent to the Clerk of the Federal Circuit at the U.S. Court of Appeals for the Federal Circuit, 717 Madison Place, N.W., Washington, DC 20439, accompanied by the requisite fee paid on pay.gov, on the date signed below:

**PATENT OWNER DIVX, LLC'S**
**NOTICE OF APPEAL**

Respectfully submitted,

/ Parham Hendifar /
_____

Date:  February 16, 2022

# Attachment A

Trials@uspto.gov                                    Paper 70
571-272-7822                              Date:   January 26, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

————————

NETFLIX, INC. AND HULU, LLC,
Petitioner,

v.

DIVX, LLC,
Patent Owner.

————————

IPR2020-00614
Patent 7,295,673 B2

————————

Before BART A. GERSTENBLITH, MONICA S. ULLAGADDI, and
IFTIKHAR AHMED, *Administrative Patent Judges*.

ULLAGADDI, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
Dismissing In Part and Denying In Part Petitioner's Motion to Exclude
Dismissing Petitioner's Motion to Strike
Granting Patent Owner's Motion to Seal
Granting Patent Owner's Motion for Entry of Protective Order
*35 U.S.C. § 318(a)*

IPR2020-00614
Patent 7,295,673 B2

# I.   INTRODUCTION

## A.   Background

Netflix, Inc. and Hulu, LLC (collectively, "Petitioner") filed a Petition to institute an *inter partes* review of claims 1–6, 9, 10, and 13–19 ("the challenged claims") of U.S. Patent No. 7,295,673 B2 (Ex. 1001, "the '673 patent"). Paper 3 ("Pet."). DivX, LLC ("Patent Owner") filed a Preliminary Response. Paper 7 ("Prelim. Resp."). With our authorization, Petitioner thereafter filed a Preliminary Reply (Paper 9) and Patent Owner filed a Preliminary Sur-Reply (Paper 10).

We initially denied institution on September 11, 2020. Paper 11 ("DDI"). Petitioner filed a Rehearing Request (Paper 12) on October 12, 2020. We granted Petitioner's Rehearing Request and instituted an *inter partes* review on all challenged claims on the sole ground set forth in the Petition on December 16, 2020.  Paper 13 ("Institution Decision" or "Inst. Dec.").

Patent Owner filed a Response (Paper 22, "Patent Owner's Response" or "PO Resp."), Petitioner filed a Reply (Paper 31, "Petitioner's Reply" or "Pet. Reply"), and thereafter, Patent Owner filed a Sur-Reply (Paper 50, "Patent Owner's Sur-Reply" or "PO Sur-Reply").

An oral hearing was held on November 10, 2021, and a transcript of the hearing (Paper 67, "Tr." or "Transcript") has been entered into the record.

Patent Owner also filed a Motion to Seal Exhibits 2004–2006, 2010, and 2020 (Paper 26, "Mot. Seal") accompanied by an Unopposed Motion for Entry of Protective Order (Paper 27, "Mot. Prot.").  Petitioner opposed

IPR2020-00614
Patent 7,295,673 B2

Patent Owner's Motion to Seal (Paper 28, "Pet. Opp. Mot. Seal") and Patent
Owner replied to Petitioner's Opposition (Paper 34, "PO Reply Mot. Seal").

    Petitioner timely objected to Patent Owner's evidence (Papers 23, 24,
51) and thereafter filed a Motion to Exclude Exhibits 2004–2007, 2010–
2020, and 2032 (Paper 52, "Mot. Ex.").  Patent Owner opposed Petitioner's
Motion to Exclude (Paper 53, "PO Opp. Ex."), and Petitioner replied to
Patent Owner's Opposition (Paper 58, "Pet. Reply Ex."). Petitioner also
filed a Motion to Strike Exhibit 2032 and Portions of Patent Owner's Sur-
Reply (Paper 55, "Mot. St."), Patent Owner opposed (Paper 61, "PO Opp.
St."), and Petitioner replied to Patent Owner's Opposition (Paper 64, "Pet.
Reply St.").

    Petitioner objected to certain portions of Patent Owner's
demonstratives. Paper 65. Patent Owner objected to certain portions of
Petitioner's demonstratives.  Paper 66.

### B.    *Real Party in Interest*

    Petitioner identifies "Netflix, Inc. and Hulu, LLC" as the real parties
in interest for this proceeding.  Pet. 82.  Patent Owner identifies "DivX, LLC
and DivX CF Investors LLC" as the real parties in interest for this
proceeding.  Paper 5, 1.

### C.    *Related Proceedings*

    The parties identify the following related district court proceedings:
(1) *DivX, LLC v. Netflix, Inc.*, No. 2:19-cv-01602 (C.D. Cal.) and (2) *DivX,
LLC v. Hulu, LLC*, No. 2:19-cv-1606 (C.D. Cal.). Pet. 82; Paper 5, 1.

### D.    *The '673 Patent*

    The '673 patent concerns generating and decrypting "a protected
stream of compressed video content" from "an input stream of compressed

IPR2020-00614
Patent 7,295,673 B2

video content containing a sequence of frames." Ex. 1001, code (57).
Specifically, a "set of encrypted frames are created by encrypting selected
frames of the sequence of frames in accordance with a frame encryption
function." *Id.* Frame decryption information for decrypting the encrypted
frames is included with the encrypted frames and unencrypted frames in the
protected stream. *Id.* "[T]he frame decryption information includes data
distinguishing the encrypted frames from the unencrypted frames of the
compressed video content within the protected stream," so that encrypted
frames can be "decrypted in accordance with the frame decryption
information." *Id.*

The '673 patent discloses an "encryption layout or frame encryption
function" in which "selective placement of encrypted material consistent
with an encryption layout function permits, for example, the recovered video
stream to reflect a desired degree of perceived degradation or 'scrambling.'"
*Id.* at 5:32–35. Two such encryption layout approaches are "header layout"
and "middle layout." *Id.* at 5:41–43. "[H]eader layout encryption can result
in a visual blackout of the associated video through placement of encrypted
material within critical areas of the header portion of a given frame." *Id.* at
5:44–47. That is, "when the applicable encryption layout or frame
encryption function prescribes that the header data of a given frame is
encrypted, a sufficiently large amount of video information may become
unusable such that the frame is effectively 'blacked out' (i.e., is skipped
during playback)." *Id.* at 5:36–41. "The 'middle layout' approach
contemplates the placement of encrypted material at a location
corresponding to a specified offset into the frame, which has the effect of

IPR2020-00614
Patent 7,295,673 B2

locating the scrambled effect within a desired area upon playback of the video containing the frame." *Id.* at 5:49–54.

Figure 5 illustrates the header layout and middle layout examples of the encryption layout approach for a video stream formatted under the MPEG-4 standard.



**FIG. 5**

Figure 5 "provides an overview of header layout and middle layout encryption . . . as applied to various frames formatted consistently with the MPEG-4 standard." *Id.* at 4:61–64.

MPEG-4 video stream 500, shown in Figure 5, includes "intra frames (i-frames), predictive frames (p-frames), and bi-direction predictive frames (b-frames)." *Id.* at 5:58–60. "Encrypted portion 510 of i-frame 505 is located at the beginning of the frame, thus indicating that header layout encryption has been applied." *Id.* at 5:62–65.  Accordingly, if the video

5

IPR2020-00614
Patent 7,295,673 B2

stream were displayed without being decrypted, "the header of i-frame 505 would cause a blacked-out portion to appear in such visual display during the interval corresponding to i-frame 505." *Id.* at 5:65–6:2. Alternatively, "[t]he encrypted portion 525 of p-frame 520 [can be] applied with an offset, thus indicating that middle layout encryption has been applied." *Id.* at 6:5–7. In this case, if the video stream were displayed without being decrypted the p-frame would appear "as a random static-like pattern." *Id.* at 6:7–9.

The '673 patent further discloses applying "header and offset encryption at a predetermined frequency with respect to each frame type." *Id.* at 8:5–7. According to the '673 patent, "the application frequency of each type of encryption offset (i.e., header and middle offset) with respect to the various frame types can be based upon a function or series." *Id.* at 8:11–14. For example, "a Fibonacci series could be used, resulting in a specified encryption offset being applied at frame numbers 1, 1, 2, 3, 5, 8, 13, 21" or "a non-linear function could be used so that any pattern to the offsets would be difficult to detect." *Id.* at 8:14–18.

### E.    Illustrative Claims

Petitioner challenges claims 1–6, 9, 10, and 13–19 of the '673 patent. Claims 1 and 14 are independent and are reproduced below.

> 1.    A method for producing a protected stream of compressed video content, said method comprising:
>
>    receiving an input stream of compressed video content containing a sequence of frames;
>
>    generating a frame encryption key and storing the encryption key in a key table;
>
>    creating a set of encrypted frames by encrypting at least selected portions of selected frames of said sequence of frames

IPR2020-00614
Patent 7,295,673 B2

using the frame encryption keys in accordance with a frame encryption function;

generating frame decryption information necessary to decrypt said set of encrypted frames including an encryption key pointer identifying a decryption key to be used in the decryption of each encrypted frame; and

assembling at least said set of encrypted frames, unencrypted frames of said sequence of frames, and said frame decryption information to produce the protected stream of compressed video content;

wherein said frame decryption information is synchronized with said set of encrypted frames into a synchronized frame decryption stream.

Ex. 1001, 11:39–60.

14.    A method for decrypting a protected stream of compressed video content comprising:
receiving an input stream of compressed video content containing encrypted frames and unencrypted frames;

receiving frame decryption information necessary to decrypt said encrypted frames, said frame decryption information is synchronized with said set of encrypted frames into a synchronized frame decryption stream and distinguishes said encrypted frames from said unencrypted frames;

obtaining an applicable frame decryption key from the received frame decryption information; and

decrypting selected portions of said encrypted frames using a frame decryption function in accordance with said frame decryption information, which identifies the specific portions of the frames to be decrypted and the applicable frame decryption key from the frame decryption information.

*Id.* at 12:47–64.

F.    *Asserted Ground of Unpatentability*

Petitioner challenges claims 1–6, 9, 10, and 13–19 as follows.  *See*

Pet. 8.  In support, Petitioner relies on the First and Second Declarations of

IPR2020-00614
Patent 7,295,673 B2

Dr. Patrick McDaniel (Exs. 1003, 1019).  Petitioner also relies on the
Declaration of Dr. James A. Storer (Ex. 1035).[1]

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 1–6, 9, 10, 13–19 | 103 | Ueno,[2] Fetkovich,[3] Demos[4] |

Patent Owner supports its arguments with the Declaration of Dr. Seth
Nielsen (Ex. 2008).

### G.   Principles of Law

"In an [*inter partes* review], the petitioner has the burden from the
onset to show with particularity why the patent it challenges is
unpatentable." *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed.
Cir. 2016) (citing 35 U.S.C. § 312(a)(3) (requiring *inter partes* review
petitions to identify "with particularity . . . the evidence that supports the
grounds for the challenge to each claim")). This burden of persuasion never
shifts to Patent Owner.  *See Dynamic Drinkware, LLC v. Nat'l Graphics,
Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015) (discussing the burden of proof in
*inter partes* review).

---

[1] Dr. McDaniel was not available to be deposed because of a medical
condition, and, as such, we allowed Petitioner to replace him with a new
expert, Dr. James A. Storer. Paper 48, 1, 7. Petitioner represented that
Dr. Storer was willing to adopt the opinions set forth in Dr. McDaniel's
Second Declaration, as well as portions of Dr. McDaniel's First Declaration
that were cited in his Second Declaration. *Id.* at 2. We mitigated prejudice
to Patent Owner by, *inter alia*, allowing Patent Owner to file exhibits with
its Sur-Reply.  *Id.* at 7.
[2] U.S. Patent 5,574,785, issued Nov. 12, 1996 (Ex. 1004, "Ueno").
[3] U.S. Patent 7,151,832 B1, issued Dec. 19, 2006 (Ex. 1005, "Fetkovich").
[4] U.S. Patent 6,957,350 B1, issued Oct. 18, 2005 (Ex. 1006, "Demos").

IPR2020-00614
Patent 7,295,673 B2

> As set forth in 35 U.S.C. § 103(a),

> [a] patent may not be obtained . . . if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

The question of obviousness is resolved on the basis of underlying factual determinations including: (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of ordinary skill in the art; and (4) when in evidence, objective evidence of nonobviousness. *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966). An obviousness analysis "need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007); *accord In re Translogic Tech., Inc.*, 504 F.3d 1249, 1259 (Fed. Cir. 2007). However, Petitioner cannot satisfy its burden of proving obviousness by employing "mere conclusory statements." *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1380 (Fed. Cir. 2016). Instead, Petitioner must articulate a reason why a person of ordinary skill in the art would have combined the prior art references. *In re NuVasive*, 842 F.3d 1376, 1382 (Fed. Cir. 2016). The scope of the prior art includes all analogous art. *Donner Tech., LLC v. Pro Stage Gear, LLC*, 979 F.3d 1353, 1359 (Fed. Cir. 2020).

We analyze the asserted ground of unpatentability in accordance with these principles to determine whether Petitioner has met its burden to demonstrate by a preponderance of the evidence that the challenged claims are unpatentable.

IPR2020-00614
Patent 7,295,673 B2

### H.    Level of Ordinary Skill in the Art

Petitioner contends

> A person of ordinary skill in the art ("POSITA") for the
> '673 patent would have had a bachelor's degree in electrical
> engineering, computer science, or a similar field with at least two
> years of experience in streaming video security (which would
> include experience with video encoding and cryptography), or a
> person with a master's degree in electrical engineering, computer
> science, or a similar field with a specialization in streaming video
> security.

Pet. 17 (citing Ex. 1003 ¶¶ 58–60). Dr. Nelson disagrees with Petitioner's
proposed level of ordinary skill in the art (*see* Ex. 2008 ¶¶ 34–37), but Patent
Owner does not appear to cite to or rely on Dr. Nelson's opinion as to this
issue. *See generally* PO Resp. Nor does Patent Owner appear to address
expressly this issue in its Patent Owner Response. *See id.*

We determine that the level of ordinary skill in the art proposed by
Petitioner is consistent with the '673 patent and the asserted prior art. *See
Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001); *In re GPAC
Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995); *In re Oelrich*, 579 F.2d 86, 91
(CCPA 1978). We adopt Petitioner's position as to that level in rendering
the findings and conclusions in this Decision.

### II.    CLAIM CONSTRUCTION

We apply the same claim construction standard used by Article III
federal courts and the United States International Trade Commission, which
follow *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (en banc), and
its progeny.  37 C.F.R. § 42.100(b) (2019).  The standard includes
construing each challenged claim of the '673 patent "in accordance with the
ordinary and customary meaning of such claim as understood by one of

IPR2020-00614
Patent 7,295,673 B2

ordinary skill in the art and the prosecution history pertaining to the patent." *Id.*

> A.     *Frame Encryption Function and Frame Decryption Function*

Independent claim 1 recites, *inter alia*, "creating a set of encrypted frames by encrypting at least selected portions of selected frames of said sequence of frames using the frame encryption keys in accordance with a frame encryption function." Ex. 1001, 11:46–49. Independent claim 14 recites, *inter alia*, "decrypting selected portions of said encrypted frames using a frame decryption function in accordance with said frame decryption information, which identifies the specific portions of the frames to be decrypted and the applicable frame decryption key from the frame decryption information."  *Id.* at 12:59–64.

The Petition primarily relies on its showing for "frame encryption function" as recited in claim 1 to teach or suggest the "frame decryption function" recited in claim 14.  *See, e.g.*, Pet. 76.  This reliance is due, in part, to the fact that the cited "references teach using symmetric algorithms," which use the same key for encrypting and "decrypting the selected portions of encrypted frames in accordance with the frame decryption information." *Id.* at 78 (citing Ex. 1004, 1:16–20; Ex. 1005, 6:52–56; Ex. 1006, 27:65–28:1; Pet. §§ VI.A.1, VI.A.5 (claim 4); Ex. 1003 ¶ 257).  Accordingly and as we determined in our Institution Decision, "the encryption parameters are the same for encryption and decryption" in Petitioner's challenge.  Inst. Dec. 8.

For at least this reason, we resolve one of the parties' disputes by applying our determinations for "frame encryption function," discussed in detail below, to "frame decryption function."

11

IPR2020-00614
Patent 7,295,673 B2

In its Petition, Petitioner does not propose to expressly construe any particular claim term and instead, contends that "[t]he challenged claims are invalid under their plain and ordinary meaning."  Pet. 18 (citing Ex. 1003 ¶¶ 108–109). In its Preliminary Response, Patent Owner contended that "frame encryption function" should be construed as "a function that determines the layout of encrypted portions of the frame."  Prelim. Resp. 23. Considering these positions and based on our review of the '673 patent specification, we preliminarily determined that "the claim term frame encryption function requires specifying the location, by layout or offset, of a portion in a frame to which encryption is applied and the pattern of application of each layout or offset with respect to each type of frame in a set of frames" in our Decision Denying Institution. DDI 9. We maintained that preliminary determination in our Institution Decision.  Inst. Dec. 7. We also determined, in our Institution Decision, "that the claimed frame decryption function is the inverse of the frame encryption function and encompasses 'specifying the location, by layout or offset, of a portion in a frame to which decryption is applied and the pattern of application of each layout or offset with respect to each type of frame in a set of frames,' for the reasons discussed in Section IV.B.2 [of the Institution Decision]." *Id.* at 6 (citing *id.* § IV.B.2).

Based on our review of the entire record developed during trial, we do not change our earlier determinations as to "frame encryption function" and "frame decryption function" in this Decision, except as to now further determine whether "specifying the location, by layout or offset" for each of these two claim terms includes specifying sub-frame structures, or whether this phrase is limited to specifying data units as bytes, as discussed below.

IPR2020-00614
Patent 7,295,673 B2

We adopt, in this Decision, the analysis of the claimed "frame encryption
function" in our initial Decision Denying Institution (DDI 7–9) and do not
repeat it herein. We also adopt the analysis of the claimed "frame
decryption function" in our Institution Decision (Inst. Dec. 5–8) and not
repeat it herein.

Patent Owner takes the position that "[t]he record supports the
Board's construction . . . ." PO Resp. 13 (citing PO Resp. 21–24; DDI 7–
11). Patent Owner argues that "*Fetkovich*'s 'encryption parameters' specify
portions of the frame to be encrypted based on the frame substructure being
encrypted," and "***not*** based on location, by layout or offset, of a portion in
the frame to which encryption is applied" because "frame substructures,
such as slices and macroblocks, do not . . . have a fixed 'location' in the
frame." *Id.* at 23. Patent Owner further argues that "frame encryption
function" instead requires that "each frame is only encrypted, for example, at
the *byte offset* within the frame for a specified number of *bytes* so as to
ensure decryption would not exceed a certain processing cap," which
"allows processing power necessary to decrypt each frame to be bounded in
advance." *Id.* at 5 (citing Ex. 2008 ¶ 52; Ex. 1001, 1:16–20, 3:49–51,
10:30–34) (emphasis added).

Petitioner takes the position that its sole challenge "satisfies the frame
encryption/decryption function by teaching, e.g., two aspects: (1) encryption
algorithms and (2) a selection process that specifies portions of selected
frames to encrypt/decrypt, e.g., with encryption parameters" and that its
showing "meets the Board's construction." Pet. Reply 3 (citing Pet. 33–35;
Inst. Dec. 14–16; Ex. 1019 ¶¶ 15–16). Still, Petitioner notes that it does "not
agree that the claims require 'specifying . . . the pattern of application of

13

IPR2020-00614
Patent 7,295,673 B2

each layout or offset with respect to each type of frame'" because "[t]he '673 patent uses permissive rather than restrictive language in describing this feature." *Id.* at 3 n.1 (alteration in original) (citing Ex. 1001, 8:5–18). Petitioner argues that "while bytes are used in some embodiments, the '673 specification uses [the] broader language of '*units*' and makes clear that bytes are just one *non-limiting example* of the units in an encryption layout." *Id.* at 7 (citing Ex. 1001, 6:25–38 ("In an exemplary embodiment . . . twelve data *units* (e.g., *bytes*) would be encrypted at the location consistent with the applicable encryption layout format" (emphasis added)); Ex. 1019 ¶ 23); *see also id.* at 9 (citing Ex. 1001, 6:31–35, 8:1–4, 8:21–24) (Petitioner arguing that "[t]he '673 patent states that the location of encrypted portions may be specified based on 'units'"). In the same vein, Petitioner persuasively argues that, "[i]gnoring the broader disclosures in the specification, PO [Patent Owner] asks the Board to limit 'frame encryption/decryption function' to specific examples. This is improper, and the Federal Circuit has repeatedly warned against it." *Id.* (citing *Phillips*, 415 F.3d at 1323; *Nazomi Commc'ns, Inc. v. ARM Holdings, PLC*, 403 F.3d 1364, 1369 (Fed. Cir. 2005)).

Petitioner further argues that during prosecution, the Examiner cited portions of U.S. Patent No. 5,805,700 (Ex. 1010, "Nardone") that "do not explicitly specify location/size using bytes," and that "Applicant appears to have conceded that Nardone teaches the frame encryption function by amending claim 1 to add other limitations including, e.g., a key table." *Id.* at 11 (citing Ex. 1002, 72–73, 92; Ex. 1010, 4:14–5:9). Petitioner asserts that "Applicant never mentioned bytes or sub-frame structures" during prosecution. *Id.*

14

IPR2020-00614
Patent 7,295,673 B2

In response to Patent Owner's argument that "*slices* and macroblocks
do not 'have a *fixed* "location" in the frame,'" Petitioner argues "the '673
patent does not require the location of the encrypted portion to be the same
for each frame—in some embodiments the location of the encrypted portion
for each frame varies." *Id.* at 10 (citing PO Resp. 23; Ex. 1001, Fig. 5, 6:3–
24). Petitioner also argues that Patent Owner

> contradicts its own district court allegations, which rely on
> encrypting portions of *slices* within a frame (which, according to
> [Patent Owner], change location). For the frame encryption
> function, [Patent Owner] accuses H.265 encryption of selected
> [Network Abstraction Layer ("NAL")] units (slices), including
> parameters that specify portions of NAL units within a frame to
> encrypt.

*Id.* (citing Ex. 1024, 17–21 ("For example, within the first sample,
subsample 8 is an IDR slice (as shown below), a NAL unit containing video
information. This subsample contains 80 encrypted bytes and 11
unencrypted bytes.")); *but see* PO Sur-Reply 13–14 (citing Ex. 1024, 19–20)
(Patent Owner arguing that Petitioner is "wrong" for characterizing its
District Court infringement contentions as pointing to frame sub-structures
to teach the claimed "frame encryption function" and instead argues that
Patent Owner "alleged that infringing devices identify both the encryption
location and size based on the number of bytes, referred to as
"NumClearBytes" and "NumEncryptedBytes"). Petitioner argues that "[a]s
PO admits, *a NAL unit is a slice*" and that "PO alleged the frame encryption
function is satisfied by specifying the location of encrypted portions of a
frame *based on slices*," which are "(NAL units) [that] are variable in size
and not 'fixed' bytes that PO now contends are necessary." Pet. Reply 10
(citing Ex. 1024, 22 ("The IDR *slice* and TRAIL_R *slices* discussed above

IPR2020-00614
Patent 7,295,673 B2

are VCL *NAL units* and carry frame information." (emphasis added));
Ex. 1025, 23, 29, 52, 82; Ex. 1029, 178:14–180:17, 187:25–189:22, 193:10–
194:8).

We determine that Petitioner's position—that the layout or offset
specified by the frame encryption function *can* be specified in terms of "sub-
frame structures," such as slices or macroblocks—is the better one.

The '673 patent discloses that "specification of an encryption quantity
of 12 (i.e., n=12) means that in every frame subject to encryption, twelve
*data units* (*e.g., bytes*) would be encrypted at the location consistent with the
applicable encryption layout format." Ex. 1001, 6:31–35 (emphasis added).
The '673 patent further discloses that "[t]he offset may range from one up to
a maximum value equivalent to the frame size less the number of bytes to
encrypt." *Id.* at 7:59–61; *see also id.* at 9:35–39 ("the frame decryption
information identifies, with respect to each frame of encrypted video stream
950, the frame number, the status of encryption (on encryption or off), the
offset length, the number of bytes encrypted, and a reference to the
applicable encryption key"), 9:50–54 ("With an offset of zero, encryption
begins immediately after video object plane start code 952 and continues for
n bytes. The byte encryption quantity, n, is also stored within the portion of
the frame decryption information 995 corresponding to the first frame
954."), 7:59–61, 8:24–26.

We agree with Petitioner that Patent Owner "seeks to limit the
Board's construction to specific examples in the '673 specification." Pet.
Reply 12. "We depart from the plain and ordinary meaning of claim terms
based on the specification in only two instances: lexicography and
disavowal" in which "[d]isavowal requires that 'the specification [or

16

IPR2020-00614
Patent 7,295,673 B2

prosecution history] make[] clear that the invention does not include a
particular feature,' or is clearly limited to a particular form of the invention."
*Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1371–72 (Fed. Cir.
2014) (citing *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362,
1365 (Fed. Cir. 2012)). None of the cited portions of the '673 patent nor the
cited portions of the prosecution history make clear that "frame encryption
function" is limited to specifying layout or offset only in bytes, or any other
specific type of data unit. *See Thorner*, 669 F.3d at 1366–67 (holding that it
is "not enough that the only embodiments, or all of the embodiments,
contain a particular limitation," that limitations are not read "from the
specification into claims" and that, "[t]o constitute disclaimer, there must be
a clear and unmistakable disclaimer").

In each relevant disclosure in the '673 patent, "bytes" are an
exemplary data unit of encryption or decryption, not a required unit, and in
one cited portion, bytes are *expressly disclosed* as being an exemplary form
of data unit. *See* Ex. 1001, 6:31–35. We are persuaded by Petitioner that,
"[e]ven if those examples had benefits, it would still be improper to limit the
claims to those examples because none of the purported benefits constitute
'clear and unmistakable' disavowal of embodiments lacking the benefits."
Pet. Reply 12 (citing *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 844
(Fed. Cir. 2010), *aff'd*, 564 U.S. 91 (2011)).

### B.   Synchronized Frame Decryption Stream

Claim 1 recites

> generating frame decryption information necessary to decrypt
> said set of encrypted frames including an encryption key pointer
> identifying a decryption key to be used in the decryption of each
> encrypted frame; and assembling at least said set of encrypted

IPR2020-00614
Patent 7,295,673 B2

> frames, unencrypted frames of said sequence of frames, and said
> frame decryption information to produce the protected stream of
> compressed video content; wherein said frame decryption
> information is synchronized with said set of encrypted frames
> into a *synchronized frame decryption stream.*

Ex. 1001, 11:50–53 (emphasis added).

Claim 14 recites "receiving frame decryption information necessary to decrypt said encrypted frames, said frame decryption information is synchronized with said set of encrypted frames into a *synchronized frame decryption stream* and distinguishes said encrypted frames from said unencrypted frames." *Id.* at 12:51–56.

Neither party proposes an express definition for this term.

According to Patent Owner, the Petition premises its sole ground on the allegation that "'[a] POSITA' would *modify* or *combine* its references in order to disclose 'embedding the decryption information *for each frame* of the protected data stream before the data of the corresponding video frame'" [and] does not challenge the fact that a "synchronized . . . stream" should be construed to require decryption information for every encrypted frame. PO Resp. 36 (alteration in original) (citing Pet. 47, 50 ("A POSITA would have been motivated to apply Ueno's teaching by including frame decryption information with each frame . . . .")). Patent Owner contends "that merely sending frame decryption 'information' is not sufficient to meet these limitations: rather, the information must be sent in a 'stream.'" *Id.* (citing Ex. 1002, 142 (Notice of Allowance, Examiner's Amendment)); *see also* PO Sur-Reply 16 (Patent Owner arguing that "'synchronized frame decryption stream' requires . . . a 1:1 synchronized correspondence between the decryption information and an encrypted frame").

IPR2020-00614
Patent 7,295,673 B2

Patent Owner further contends that sending encryption parameters only when the parameters are updated does not teach or suggest the claimed "synchronized frame decryption stream." PO Resp. 37–38. According to Patent Owner, the '673 patent "identifies the frame number to which the encryption information corresponds so that the encryption information is linked and synchronized with its corresponding frame." *Id.* at 57. The deficiency in Petitioner's challenge, Patent Owner contends, is that it "seems to assume that interleaving the encryption key in between frames would result in a synchronized frame decryption stream," but that "in a lossy transmission system, interleaving the keys between frames does not synchronize them with frames." *Id.* at 56 (citing Pet. 7 ("Decryption information was commonly interleaved with frames, and in that sense was synchronized with the frames ......."))).

Petitioner contends that Patent Owner "argues frame decryption data must be sent with each frame and include frame numbers," but "never explains why this would be necessary, other than suggesting the claim should be limited to the embodiment of FIG. 9." Pet. Reply 15 (citing PO Resp. 33, 45, 57–58). Petitioner presents two alternative positions on how the combination of Ueno, Fetkovich, and Demos teaches or suggests the claimed "synchronized frame decryption stream." According to its first position, Petitioner contends that "the combination begins with Ueno's key table and its teaching that, 'in some cases, the cipher key number is . . . *transmitted with each of [the] frames.*'" *Id.* at 16 (first alteration in original) (citing Ex. 1004, 2:5–9; Pet. 50–51). Petitioner explains that "Fetkovich's encryption parameters are included with Ueno's key number, which is sent with each frame." *Id.* at 16–17 (citing Pet. 20; Ex. 1003 ¶ 115). Thus,

IPR2020-00614
Patent 7,295,673 B2

according to this first alternative position, Petitioner implicitly construes
"synchronized frame decryption stream" as requiring the sending of "frame
decryption information" with *each* frame, presumably because the "frame
decryption information" includes "an encryption key pointer identifying a
decryption key to be used in the decryption of *each* encrypted frame," as
recited in claim 1.  Petitioner's first alternative position corresponds to
Patent Owner's position, which requires "a 1:1 synchronized correspondence
between decryption information and an encrypted frame."  *See* PO Sur-
Reply 16.

   In its second alternative position implicitly construing "synchronized
frame decryption stream," Petitioner contends that "the claims would allow
one chunk of decryption data to correspond to several frames." Pet. Reply
24–25. Petitioner explains that "[w]hen keys/parameters are only sent when
changed, that 'decryption information is used to decrypt each frame' until
'the last frame before new encryption parameters are received.'" *Id.* (citing
Ex. 1003 ¶ 175; Pet. 42). According to Petitioner, "each frame has
corresponding decryption data" and "[t]he keys/parameters are interleaved
with corresponding video frames into a stream and *provide* decryption
information for each frame."  *Id.* (citing Ex. 2009, 95:5–15; Ex. 1003 ¶ 184;
Ex. 1005, 7:35–50, 7:55–67) (emphasis added).

   The '673 patent depicts, in Figure 9, an "exemplary embodiment" in
which "the frame decryption information 995 identifies, with respect to each
frame of encrypted video stream 950, the frame number, the status of
encryption (on or off), the offset length, the number of bytes encrypted, and
a reference to the applicable encryption key." Ex. 1001, 9:35–39, 9:27–30.
The '673 patent further discloses that "[i]n the exemplary embodiment[,] the

IPR2020-00614
Patent 7,295,673 B2

decryption information 995 may be incorporated within or otherwise transmitted in conjunction with the encrypted video stream 950." *Id.* at 9:27–30. Nowhere does the '673 patent indicate that the frame decryption information *must* be sent with *each* corresponding frame according to a 1:1 correspondence. Even if every embodiment were to disclose or depict a synchronized frame decryption stream with a 1:1 correspondence between frame decryption information and corresponding frame, the Federal Circuit has "repeatedly held that it is 'not enough that the only embodiments, or all of the embodiments, contain a particular limitation' to limit claims beyond their plain meaning." *Unwired Planet, LLC v. Apple Inc.*, 829 F.3d 1353, 1359 (Fed. Cir. 2016) (citing *Thorner*, 669 F.3d at 1366; *GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014)).

The specification of the '673 patent does not support limiting "synchronized frame decryption stream" to frame decryption information sent with *each* frame in a 1:1 correspondence. Instead, we determine that Petitioner's position that "synchronized frame decryption stream" encompasses providing "one chunk of decryption data [] correspond[ing] to several frames" is consistent with the disclosures of the '673 patent. Pet. Reply 25.

We further note that claim 1's encrypted frames, unencrypted frames, *and* frame decryption information are assembled into a protected stream of compressed video content. By virtue of its inclusion in the "protected stream of . . . content," the frame decryption information is already in a stream format and synchronized with the claimed "set of encrypted frames." Thus, whatever is cited to teach the claimed "assembling" limitation and in particular, "protected stream of compressed video content," is also sufficient

IPR2020-00614
Patent 7,295,673 B2

to teach the "synchronized frame decryption stream." The "synchronized
frame decryption stream" does not require any particular sort of correlation
with the frames, unencrypted and encrypted, for the frame decryption
information to be considered "synchronized" with the same or to be
considered to have a "stream" format. Interleaving frame decryption
information, as disclosed and depicted in the '673 patent, to include frame
decryption information between encrypted and unencrypted frames is
sufficient. *See* Pet. Reply 14 (citing Pet. 50; Ex. 1011 (DivX Amended
Complaint Against Netflix) ¶ 276).[5]

     As such, Patent Owner's interleaving arguments, which make
reference to the type of transmission system (i.e., lossy or lossless) as a
qualifier for including frame decryption information in a 1:1 correspondence
with the encrypted frames, are unavailing.  *See* PO Resp. 55–57.

     For the foregoing reasons, we determine that "synchronized frame
decryption stream" encompasses frame decryption information that is
provided when there is a key update in an interleaved fashion with said set
of encrypted frames. The claim term does not require sending frame
decryption information with *each* corresponding frame in a 1:1
correspondence, contrary to Patent Owner's arguments.

---

[5] Our finding is consistent with Patent Owner's position taken in district
court in which it argued that "Netflix's 'frame decryption information is
synchronized with said set of encrypted frames into a synchronized frame
decryption stream' when Netflix synchronizes the frame decryption information
by interleaving the PIFF Sample Encryption Boxes (uuid) and media data, or
"mdat," boxes throughout the MP4 file.").  Ex. 1011 ¶ 276.

IPR2020-00614
Patent 7,295,673 B2

### III.    ANALYSIS

#### A.    Challenge to Claims 1–6, 9, 10, and 13–19

Petitioner asserts that claims 1–6, 9, 10, and 13–19 would have been obvious over Ueno, Fetkovich, and Demos. *See* Pet. 18–82. For the reasons that follow, we are persuaded that Petitioner establishes unpatentability of the challenged claims over the combination of Ueno, Fetkovich, and Demos by a preponderance of the evidence.

#### 1.    Ueno (Ex. 1004)

Ueno concerns "[a]n enciphered communication system . . . which has a plurality of cipher keys selectively used for enciphering data, wherein even when a cipher key number used at a transmitting side is not correctly transmitted to a receiving side, the receiving side can change the cipher key to a correct one." Ex. 1004, code (57). The transmitter and receiver "are each provided with a plurality of cipher keys, a cipher key number is allotted to each cipher key, and a collation table consisting of the cipher keys and the cipher key numbers corresponding thereto is stored in each of the cipher key tables." *Id.* at 5:15–20. To change a cipher key, Ueno discloses setting a "cipher key number N(ks) so that a corresponding one of the pre-stored cipher keys ks may be selected." *Id.* at 5:20–23. "[T]he cipher key number N(ks) is notified to the receiving side" via a multiplexing section of the transmitter, which "multiplex[es] the enciphered data and the cipher key number N(ks)." *Id.* at 5:27–29, 4:55–57.

#### 2.    Fetkovich (Ex. 1005)

Fetkovich concerns "[d]ynamic varying of encrypting of a stream of data at an encryption unit based on data content." Ex. 1005, code (57). The variation in encryption "can be responsive to passage of a predefined

IPR2020-00614
Patent 7,295,673 B2

number of units of physical data or passage of a predefined number of
conceptual units of data, [and] is accomplished by changing at least one
encryption parameter over different portions of the data." *Id.* For example,
in "an MPEG video data stream, this might mean that after a certain number
of macroblocks, slices, fields, frames, pictures, groups of pictures (GOPs),
or sequences have been sent and received, an encryption parameter (such as
an encryption key) is automatically updated." *Id.* at 4:13–18.

### 3.    Demos (Ex. 1006)

Demos concerns "[a] method and apparatus for image compression
using temporal and resolution layering of compressed image frames, and
which provides encryption and watermarking capabilities." Ex. 1006,
code (57). Demos discloses "[e]ncryption preferably operates in a fashion as
to scramble, or at least visibly impair, as many frames as possible from the
smallest possible units of encryption." *Id.* at 22:29–31. For MPEG systems,
which "utilize a hierarchy of units of information which must be processed
in cascade in order to decode a range of frames (a 'Group of Pictures,' or
GOP)," "not every unit need b[e] encrypted or confounded by the encryption
of a higher-level unit." *Id.* at 22:32–36, 22:40–41. "Thus, in selecting units
to encrypt, it is useful to note how encryption of particular units can
confound the usability of other related units." *Id.* at 23:23–25.

### 4.    Claim 1

#### a)    Element-by-Element Analysis of Claim 1

*[1a] A method for producing a protected stream of
compressed video content, said method comprising:*

Although Petitioner contends that the proposed combination "teaches
or suggests a method for producing a protected stream of compressed video

IPR2020-00614
Patent 7,295,673 B2

content (e.g., the partially-encrypted stream described in the analysis for the rest of claim 1)," Petitioner shows how each of the references, individually, teaches the preamble of claim 1. Pet. 29 (citing Ex. 1003 ¶¶ 144–145). For example, Petitioner contends "Fetkovich teaches producing a protected stream of compressed digital video content." *Id.* (citing Ex. 1005, 1:16–19; 6:49–65, 7:8–27, Fig. 2). Petitioner presents similar arguments for Demos and Ueno. *Id.* (citing Ex. 1006, 21:20–22, Fig. 13 (arguing "Demos further teaches this limitation"); Ex. 1004, code (57), 1:33–43, 2:50–67, 5:15–32, 6:54–59 (arguing "Ueno teaches a method for encrypting content and creating a stream of protected data frames")).

We are persuaded that the cited portions show how Ueno, Fetkovich, and Demos each individually teach the subject matter of the preamble of independent claim 1. We need not determine whether the preamble of claim 1 is limiting because Petitioner shows sufficiently that the subject matter is taught by the references.

> *[1b] receiving an input stream of compressed video*
> *content containing a sequence of frames;*

Although Petitioner contends that the proposed combination discloses "receiving an input stream of compressed video content (such as MPEG) containing a sequence of frames, in order to encrypt it," Petitioner points out where, individually, Fetkovich and Demos each teach limitation [1b]. Pet. 29–30 (citing Ex. 1005, 3:4–14, 6:49–57, Fig. 1; Ex. 1006, 21:10–13, 21:20–22, 22:29–39, 23:30–24:19; Ex. 1003 ¶¶ 146–149). Petitioner contends that "[t]he stream of compressed video content contains a sequence of frames; as was widely known, MPEG video contains a sequence of

IPR2020-00614
Patent 7,295,673 B2

frames/pictures." *Id.* at 30 (citing Ex. 1005, 4:37–44; Ex. 1006, 22:63–23:7; Ex. 1003 ¶¶ 148–149).

We are persuaded that the cited portions show how Fetkovich and Demos each individually teach limitation [1b].

> *[1c] generating a frame encryption key and storing*
> *the encryption key in a key table;*

Petitioner contends that individually "[t]he references teach generating a frame encryption key. . . ." Pet. 30–31 (citing Ex. 1005, 6:49–52 (teaching "a dynamic key generator"), Fig. 1; Ex. 1006, 28:1–9 ("Next, one or more keys are generated (STEP 1304) ......."), Fig. 13; Ex. 1003 ¶ 150). Petitioner further contends that "Ueno teaches storing encryption keys in a key table." *Id.* at 31 (citing Ex. 1004, 1:53–57 ("Thus, the transmitter 1 and the receiver 2 have identical cipher key tables 12 and 23, respectively, each having a plurality of cipher keys....... "), Fig. 16).

We are persuaded by Petitioner's contentions and the cited portions of Ueno, Demos, and Fetkovich that the combination teaches limitation [1c].

We discuss Petitioner's motivation to combine Ueno, Fetkovich, and Demos in Sections III.A.4.b and III.A.4.c.

> *[1d] creating a set of encrypted frames by encrypting*
> *at least selected portions of selected frames of said*
> *sequence of frames using the frame encryption keys*
> *in accordance with a frame encryption function;*

According to a first theory, Petitioner relies on Fetkovich and Demos to teach this limitation. *See* Pet. 33–35. "Fetkovich teaches encryption parameters to select which slices or macroblocks in a frame are encrypted, including 'encryption granularity, an encryption density scale, an encryption density, an encryption delay.'" *Id.* at 33 (citing Ex. 1005, 3:4–14, 5:38–56,

IPR2020-00614
Patent 7,295,673 B2

6:24–40; Ex. 1003 ¶¶ 155–156). Petitioner relies on Demos to teach
selecting which frames to encrypt. *Id.* (citing Pet. § VI.A.1; Ex. 1003 ¶ 154;
Ex. 1005, 4:37–44; Ex. 1006, 22:29–58, 23:8–24:18, Fig. 11).  According to
Petitioner, the combination therefore "teaches creating a set of encrypted
frames by encrypting at least selected portions of selected frames, which are
satisfied [in] at least three independent ways: (1) I and P frames; (2) every
other minute of video frames; or alternatively, (3) frames of particularly
important plot or action scenes."  *Id.* at 33–34 (citing Pet. § VI.A.1;
Ex. 1006, 22:29–44, Fig. 11). Each of the three ways "creates a set of
encrypted frames (the frames selected for partial encryption) and a set of
unencrypted frames (the other frames that are left unencrypted)." *Id.* at 34
(citing Ex. 1003 ¶ 157).

Petitioner further contends that "Fetkovich teaches creating a set of
encrypted frames using the frame encryption keys in accordance with a
*frame encryption function*" and that "*encryption algorithms and encryption
parameters together control the encryption process, including the portions
of the video stream to encrypt.*" *Id.* at 35 (emphasis added) (citing Ex. 1005,
3:4–14, 5:9–6:40, 6:49–65 ("Sender 12 includes an encryption unit 20 which
(in this example) receives as inputs an encryption key from a dynamic key
generator 22, and the unencrypted, but encoded MPEG data stream. Any
conventional encryption technique can be employed within encryption unit
20....... "), Fig. 1; Ex. 1003 ¶¶ 158–159, 161).

Petitioner presents a second, alternative theory in which it relies on
Demos individually to teach this limitation.  According to Petitioner,

> Demos by itself teaches or suggests the creation of a set of
> encrypted frames by encrypting at least selected portions (e.g.,
> DC coefficients or AC coefficients) of selected frames (e.g., I-

IPR2020-00614
Patent 7,295,673 B2

> frames, or I and P-frames) of said sequence of frames using the
> frame encryption keys in accordance with a frame encryption
> function (e.g., using DES, Triple DES, or Blowfish *to encrypt*
> *selected portions of selected frames*).

Pet. 35 (citing Ex. 1003 ¶¶ 162–169) (emphasis added). Petitioner also
contends "Demos further teaches 'an entire frame need not be encrypted . . .
Sub-units of frames may be encrypted and still have a confounding affect
[sic], while reducing encryption and decryption processing time.'" *Id.* at 37
(alterations in original) (citing Ex. 1006, 23:37–24:18, Table 8).

Petitioner contends that "[a] POSITA would have been motivated to
select I-frames, or I and P-frames, for partial encryption because Demos
teaches that they have 'high influence' and are thus 'better for encryption.'"
*Id.* at 36 (citing Ex. 1006, Fig. 11, 22:53–58; Pet. § VI.A.1; Ex. 1003 ¶ 164).
Petitioner further contends that "I-frames have the highest influence, but
when computational power is available, selecting both I and P-frames
provides additional security for different types of content, with a favorable
efficiency balance." *Id.* (citing Ex. 1006, Fig. 11; Ex. 1003 ¶ 163).

We are persuaded by Petitioner's contentions, Dr. McDaniel's
testimony, and the cited portions of Demos and Fetkovich that the
combination teaches limitation [1d], under either of Petitioner's alternative
positions.

> *[1e] generating frame decryption information*
> *necessary to decrypt said set of encrypted frames*
> *including an encryption key pointer identifying a*
> *decryption key to be used in the decryption of each*
> *encrypted frame; and*

Petitioner contends that "Ueno teaches storing encryption keys in key
tables where 'a cipher key number is allotted to each cipher key[.]'" Pet. 40

IPR2020-00614
Patent 7,295,673 B2

(alteration in original) (citing Ex. 1004, 5:14–20, 1:53–57, 6:54–59;
Pet. § VI.A.2[1c]). Petitioner further contends that "Ueno further teaches 'a
cipher key number sending section' that generates key numbers (e.g.,
'N(ks)'), *which are periodically transmitted to the receiver*, multiplexed into
the data stream, to facilitate decryption of the data stream by identifying the
key to be used for decrypting each *portion* of the data stream." *Id.*
(emphasis added) (citing Ex. 1004, 1:32–42, Fig. 16). More particularly,
Petitioner contends Ueno teaches: (1) *sending the key number periodically*;
(2) with each frame; *or* (3) *when the key is changed*. *Id.* (citing Ex. 1004,
2:5–9, 6:35–39, 7:28–32).  Petitioner explains that "[w]hen *the key number
is included periodically*, the decryption information is used to decrypt each
frame starting from the frame for which the key number was sent and ending
with the last frame before a new key number is received." *Id.* at 42
(emphasis added) (citing Ex. 1003 ¶ 174). Petitioner further explains
"Ueno's multiplexed key numbers are encryption key pointers that identify a
decryption key to be used in the decryption of each encrypted frame; each
key number identifies a decryption key." *Id.* at 41 (citing Ex. 1004, 1:53–57
("[O]nly the cipher key number corresponding to the cipher key which is
used to encipher the transmit data is transmitted to the receiver 2."), 5:14–
20; Ex. 1003 ¶ 172; Pet. § VI.A.1).

 According to Petitioner, "[i]n this way, the sender of the data stream
communicates to the receiver a key number corresponding to each frame, for
use as a pointer identifying the decryption key in decrypting the frame." *Id.*
at 41 (citing Ex. 1004, 1:43–60 ("The receiving side decodes the received
data to acquire the cipher key number, and obtains the same cipher key as

IPR2020-00614
Patent 7,295,673 B2

used at the transmitting side from the cipher key number to decipher the
data."); Ex. 1004, 4:60–5:3, 5:32–44, 6:60–67).

Petitioner contends that "Fetkovich teaches generating encryption
parameters that control the encryption process—including partial encryption
and the timing of how frequently keys are updated—which are necessary to
decrypt frames." *Id.* at 42 (citing Ex. 1005, 7:8–27, 6:66–7:7; Ex. 1003
¶ 175). Petitioner explains that "[a] POSITA would have understood Ueno's
key numbers and Fetkovich's encryption parameters to be frame decryption
information because they are used to control the decryption process and are
necessary for decrypting video frames." *Id.* at 42–43 (citing
Pet. §§ VI.A.2[1d], VI.A.1; Ex. 1001, Fig. 9, 9:23–39).

Petitioner further explains that "[w]ith symmetric encryption, a
POSITA would have understood the prior art teachings of key numbers and
encryption parameters to be both frame encryption information and frame
decryption information." *Id.* at 43 (citing Ex. 1003 ¶ 177).

We are persuaded by Petitioner's contentions, Dr. McDaniel's
testimony, and the cited portions of Ueno and Fetkovich that the
combination teaches limitation [1e]. We find persuasive Ueno's teaching of
sending a key number periodically and its teaching of sending the key
number when the key is changed. *See* Pet. 40 (citing Ex. 1004, 2:5–9, 6:35–
39, 7:28–32). We make this determination regarding only Petitioner's
second alternative position (sending one chunk of decryption data to
correspond to several frames), and not its first alternative position (arguing a
1:1 correspondence between frame decryption information and frames).
*Supra* § II.B; Pet. Reply 24–25.

IPR2020-00614
Patent 7,295,673 B2

> *[1f] assembling at least said set of encrypted frames,*
> *unencrypted frames of said sequence of frames, and*
> *said frame decryption information to produce the*
> *protected stream of compressed video content;*

Petitioner contends that "Ueno teaches assembling the sequence of
frames and key numbers by multiplexing them into a single protected
stream." Pet. 43 (citing Ex. 1004, 1:67–2:9 ("[T]he data transmitted onto the
transmission line 3 from the transmitter 1 consists of input data D
enciphered by the data enciphering section 11, the cipher key number N(ks)
output from the cipher key number sending section 14 and multiplexed at the
multiplexing section 15, and frame synchronizing signals F ......."), Fig. 17;
Ex. 1003 ¶ 179).

Petitioner further contends that "Fetkovich further teaches assembling
the sequence of frames—including encrypted and unencrypted frames—and
the frame decryption information by multiplexing them into a single
stream." *Id.* at 45 (citing Ex. 1005, 6:49–65 ("[T]he encrypted MPEG
stream is fed to a data multiplexer 24 which multiplexes into the stream . . .
the encryption parameters employed by the encryption unit."), 7:8–27, 5:34–
56, 6:6–7, Fig. 1; Ex. 1003 ¶ 180).

Petitioner contends that "[a] POSITA would have recognized Ueno's
key number and Fetkovich's encryption parameters to be frame decryption
information." *Id.* at 46 (citing Pet. §§ VI.A.1, VI.A.2[1e]; Ex. 1003 ¶ 181).

We are persuaded by Petitioner's contentions, Dr. McDaniel's
testimony, and the cited portions of Ueno and Fetkovich that the
combination of Ueno, Fetkovich, and Demos teaches limitation [1f].

IPR2020-00614
Patent 7,295,673 B2

> *[1g] wherein said frame decryption information is synchronized with said set of encrypted frames into a synchronized frame decryption stream.*

Petitioner contends that "[t]he combination teaches or suggests multiplexing periodic frame decryption information—including key numbers and partial encryption parameters—into the video stream, by embedding the decryption information for each frame of the protected data stream before the data of the corresponding video frame." Pet. 46–47 (citing Pet. §§ VI.A.2[1e–1f]; Ex. 1003 ¶ 182).

Specifically, Petitioner contends that "Ueno [] teaches that frame synchronization signals are used to maintain synchronization of the frames, and that key numbers are embedded into the video stream following the synchronization signal, but before the frame." *Id.* at 47 (citing Ex. 1004, 1:67–2:9 ("[D]ata transmitted . . . consists of input data D . . . the cipher key number sending section 14 and multiplexed at the multiplexing section 15, and frame synchronizing signals F."), 6:34–39, 7:27–32, Figs. 4, 6, 17; Ex. 1003 ¶ 183). According to Petitioner, "[t]he key number is 'multiplexed' in a synchronized manner with encrypted data 'D' and 'frame synchronizing signals F,' *with key numbers transmitted 'at regular intervals'* or 'with each of frames.'" *Id.* at 48 (emphasis added) (citing Ex. 1004, 1:67–2:9, 4:55–57, Fig. 17; Ex. 1003 ¶ 183).

Petitioner further contends that "Fetkovich teaches multiplexing its encryption parameters into the video stream, embedded with associated frames." *Id.* at 48 (citing Pet. § VI.A.2[1f]). According to Petitioner, "Fetkovich teaches the importance of maintaining 'synchronization' for the frame decryption process." *Id.* (citing Ex. 1005, 7:35–50). Like Ueno, "Fetkovich teaches using a 'signal' to maintain the synchronization of the

IPR2020-00614
Patent 7,295,673 B2

frame decryption information (e.g., encryption parameters) with the sequence of frames." *Id.* (citing Ex. 1005, 7:55–67 ("A mechanism for determining that encryption/decryption synchronization has been lost *might be to place a signal in the first unit of encryption (whether encrypted or not) after a key change .......*" (emphasis added)); Ex. 1003 ¶ 184).

According to Petitioner, "the combination of Ueno and Fetkovich renders obvious interleaving frame decryption information with synchronization signals into the video stream before the data of the corresponding video *frames*, thereby incorporating them into a single stream." *Id.* at 48 (emphasis added) (citing Ex. 1003 ¶ 185). "A POSITA would have understood that this frame decryption information is synchronized with the set of encrypted frames into a synchronized frame decryption stream, consistent with the '673 patent." *Id.* at 48–49 (citing Ex. 1003 ¶ 185; Ex. 1001, 9:23–39, Fig. 9). Petitioner contends that "[a] POSITA would have understood the combination teaches an analogous structure, with *periodic frame decryption information* embedded alongside the video frames, including the *key number and partial encryption parameters* used to encrypt/decrypt associated frames." *Id.* at 49–50 (emphasis added) (citing Ex. 1003 ¶ 185).

Petitioner contends that "[t]his combination teaches multiplexing, which a POSITA would have understood to be synonymous with interleaving in this context because both embed frame decryption information into a video stream alongside its corresponding video frames," and therefore, renders limitation [1g] obvious. *Id.* at 50 (citing Ex. 1004, Figs. 4, 6, 17; Ex. 1003 ¶ 185).

IPR2020-00614
Patent 7,295,673 B2

We are persuaded by Petitioner's contentions, the cited portions of
Ueno and Fetkovich, and Dr. McDaniel's testimony that the combination of
Ueno, Fetkovich, and Demos teaches limitation [1g].

b)      *Analysis of Patent Owner's Arguments*

*Patent Owner's Arguments Concerning Benefits of
the Claimed Invention*

*First*, Patent Owner contends that the '673 patent provides "a 'unique
approach' to protecting streaming video that . . . involves 'bounding the
resources consumed during decryption.'"  PO Resp. 5 (citing Ex. 2008 ¶ 51;
Ex. 1001, 3:45–48, 3:49–51, 5:25–27, 10:29–34); *see* PO Sur-Reply 10–12.
Patent Owner further contends that "the invention also permits efficient
decryption of partially encrypted frames using a generic decoder (such as
one suitable for full-encryption systems) rather than a specialized decoder."
PO Resp. 7. Patent Owner also contends that, "[b]ecause the invention's
decryption does not depend on frame sub-structure, it can be performed
before the frame enters the decoder, allowing the decoder to receive the
already-decrypted stream like in full encryption systems, so generic
decoders can be used with DivX-encrypted streams." *Id.* at 9; *see* PO Sur-
Reply 7–10. Patent Owner still further contends that the '673 patent's
"partial frame encryption approach is useful in low-processing-power
consumer electronic devices" "that would not otherwise possess the requisite
decrypting/decoding processing power."  PO Resp. 10.

Petitioner contends, and we agree, that Patent Owner "seeks to limit
the Board's construction to specific examples in the '673 specification" and
"[e]ven if those examples had benefits, it would still be improper to limit the
claims to those examples because none of the purported benefits constitute

34

IPR2020-00614
Patent 7,295,673 B2

'clear and unmistakable' disavowal of embodiments lacking the benefits."
Pet. Reply 12 (citing *i4i Ltd. P'ship*, 598 F.3d at 844). Even if we were to
accept that all of these advantages argued by Patent Owner had evidentiary
support, the argued advantages are not recited in independent claim 1 and
the intrinsic record does not reflect any reason to import these advantages
into the reading of the claim.

*Patent Owner's Arguments Concerning the Claimed
"Frame Encryption Function"*

*Second*, Patent Owner contends that Petitioner's proposed
combination does not teach or suggest the claimed "frame encryption
function" because

> Fetkovich's "encryption parameters" specify portions of the
> frame to be encrypted based on the frame substructure being
> encrypted, not based on location, by layout or offset, of a portion
> in the frame to which encryption is applied. Furthermore, it is
> undisputed that *frame substructures, such as slices and
> macroblocks, do not in that sense have a fixed "location" in the
> frame*. Finally, construing "frame encryption function" to
> encompass Fetkovich's encryption parameters based on frame
> substructure, rather than where in the frame encryption is
> applied, would contradict the functionality of the Patent's
> embodiments and the Patent's solution to the problem it sought
> to solve.

*Id.* at 23 (emphasis added) (citing Ex. 2008 ¶ 76); *see id.* at 26 (arguing that
"the sub-structures cannot even be identified within the frame without
initiating the process of decoding the frame"); *see* PO Sur-Reply 1–4.  Patent
Owner also presents arguments disputing that Fetkovich's delay can be
considered to teach the limitations of the claim.  PO Sur-Reply 14–15.

Petitioner responds, and we agree, that "while bytes are used in some
embodiments, the '673 specification uses broader language of 'unit' and

35

IPR2020-00614
Patent 7,295,673 B2

makes clear that bytes are just one non-limiting example of the units in an
encryption layout." Pet. Reply 7 (citing Ex. 1001, 6:25–38; Ex. 1019 ¶ 23).
Petitioner further persuasively argues that "[s]lices and macroblocks are
common units of video data." *Id.* at 8 (citing Ex. 1019 ¶ 25; Ex. 1006,
22:63–23:7 ("Such units may consist of . . . sub-frame units ....... "); Ex.
1005, 4:30–44 ("an MPEG stream can be described as including the
following units: ...... picture, slice, and macroblock")).

Petitioner also persuasively argues that Patent Owner "concedes that
Fetkovich 'specif[ies] portions of the frame to be encrypted" and that Patent
Owner "only disputes whether [Fetkovich] specifies 'location' in bytes—
which . . . is not required by the claims." *Id.* at 9 (first alteration in original).
Petitioner further contends that "[e]ven if [a] 'fixed' location were required,
it is nonetheless met" because "Fetkovich teaches a delay parameter that
includes a delay of zero." *Id.* at 11 (citing Ex. 1005, 5:57–60 ("Delay . . .
This number is zero-origin.")). According to Petitioner, "encryption is
applied to the first macroblock or slice of the selected frame—which has a
fixed location." *Id.*

As discussed above in Section II.A, we do not adopt Patent Owner's
construction for "frame encryption function." That is, we determine that
"frame encryption function" is not limited to being specified in data units of
bytes, and the claim term does not exclude frame sub-structures such as
slices and macroblocks as Patent Owner argues. *Supra* § II.A. Dr. Nielsen
appears to confirm this understanding:

> MR. QIU: Is it your opinion that when the claims refer to offset,
> offset refers to nothing more than a byte offset?
>
> . . . .

IPR2020-00614
Patent 7,295,673 B2

> DR. NIELSEN: I don't see any examples in the specification of
> offsets other than byte offsets. I don't see any other possible
> interpretation of offset. *But, on the other hand, the claims just
> say offset information, so I suppose that could be not in bytes*.

Ex. 1029, 202:19–21, 203:9–14 (emphasis added). We further find
persuasive Petitioner's contention that Patent Owner "alleged the frame
encryption function is satisfied by specifying the location of encrypted
portions of a frame *based on* slices"—Petitioner contends "[t]hose slices
(NAL units) are variable in size and not 'fixed' bytes that PO now contends
are necessary." Pet. Reply 10 (citing Ex. 1025, 52, 82; Ex. 1029, 193:10–
194:8). For these reasons, Patent Owner's arguments that the combination
of Ueno, Fetkovich, and Demos does not teach or suggest the claimed
"frame encryption function" do not undermine Petitioner's challenge.

*Third*, Patent Owner argues that the claimed "frame encryption
function" "is not the same thing as an encryption transformation, such as—
according to how the Petition appears to use the phrase—DES." *Id.* at 17;
*see id.* at 8, 16, 20 (contending that Petitioner had made untimely arguments
by "argu[ing] its Petition had all along mapped the 'frame encryption
function' to the encryption transformations like DES and Fetkovich's
encryption parameters"). Patent Owner explains that "the Petition simply
asserted that the limitation 'in accordance with a frame encryption function'
is satisfied because the encryption (like all other encryptions) is conducted
using a standard transformation algorithm such as the Data Encryption
Standard (DES)." *Id.* at 16 (citing Pet. 33, 35; 76–78).

We find Patent Owner's argument that Petitioner maps "frame
encryption function" to conventional encryption transformations, such as
DES and AES, unavailing. *See* Pet. Reply 6 n.3 (citing Ex. 1024, 24–25;

IPR2020-00614
Patent 7,295,673 B2

Ex. 1023, 22; Ex. 1029, 171:22–172:6) (Petitioner arguing that Patent
Owner's "infringement contentions cite AES to argue that the frame
encryption function is met"). Petitioner does not map "frame encryption
function" to only a conventional encryption transformation—instead,
Petitioner maps "frame encryption function" to *both* encryption parameters
and a conventional encryption algorithm/transformation.

    In our Decision Denying Institution, we initially determined that
Petitioner implicitly argued that "frame encryption function" "is met by
conventional encryption algorithms such as Data Encryption Standard
(DES), Triple DES, and Blowfish." DDI 7 (citing Pet. 33–35). In our
Institution Decision, however, we determined that we misapprehended
Petitioner's position and found that Petitioner's position regarding the
claimed "frame encryption function" is based on two steps—"the step of
selecting what to encrypt, followed by the step of encrypting by providing
the selections as input to a conventional encryption algorithm." Inst. Dec. 4.

    We maintain our determination that Petitioner's position is based on
two steps and is set forth in its Petition (and therefore, is not untimely as
Patent Owner argues (PO Resp. 19–20)) because Petitioner asserts that the
frame encryption function is met as follows:

>     The combination . . . teaches or suggests creating a set of
> encrypted frames . . . using the frame encryption keys in
> accordance with *a frame encryption function* (e.g., *using DES,
> Triple DES, or Blowfish to encrypt selected portions of selected
> frames in accordance with encryption parameters*).
>    . . . .
> Fetkovich teaches *encryption algorithms and encryption
> parameters together control the encryption process*, including
> the portions of the video stream to encrypt.
>    . . . .

IPR2020-00614
Patent 7,295,673 B2

> Demos by itself teaches or suggests the creation of a set of
> encrypted frames by encrypting at least selected portions (e.g.,
> DC coefficients or AC coefficients) of selected frames (e.g., I-
> frames, or I and P-frames) of said sequence of frames using the
> frame encryption keys in accordance with *a frame encryption
> function (e.g., using DES, Triple DES, or Blowfish to encrypt
> selected portions of selected frames)*.

Pet. 33, 35 (emphasis added) (citing Ex. 1003 ¶¶153–169; Ex. 1005, 3:4–14,

5:9–6:40). The above-quoted statements resolve or at least outweigh any

ambiguity in Petitioner's position created by the assertion in the Petition that

"Ueno teaches using frame encryption keys in accordance with a frame

encryption function" accompanied by a citation to Ueno's disclosure that

"[e]nciphering methods include DES . . . ." *Id.* at 35 (citing Ex. 1004, 1:13–

20, 1:33–43, 4:46–59, 6:54–59; Ex. 1003 ¶ 160); *cf.* PO Resp. 16 (arguing

that "Petitioner's expert, also, simply mapped the claimed 'frame encryption

function' to encryption transformations such as DES"), 20–21 (arguing that

the "Petition argument was unambiguously that *Ueno* discloses the claimed

'frame encryption function' for a single reason—that it discloses utilizing

the DES encryption transformation").

In its Response, Patent Owner argues that

> [t]he specification, as well as the ordinary use of this
> language in the art, make clear, however, that the claimed "frame
> encryption function" is not the same thing as an encryption
> transformation, such as—according to how the Petition appears
> to use the phrase—DES. An encryption algorithm is an
> algorithm (such as DES) that transforms the unencrypted data to
> encrypted data.  In other words, the unencrypted data is fed to the
> transformation and the encrypted data is output from the
> transformation. The transformation, however, has no bearing on
> the layout within a frame of the encrypted data—it merely

IPR2020-00614
Patent 7,295,673 B2

transforms the data fed to it, wherever the data might happen to
fall within the frame.

PO Resp. 17.

Petitioner responds that "[t]he '673 specification uses DES/AES to
encrypt selected portions of frames." Pet. Reply 6 (citing Ex. 1001, 3:30–
33, 8:19–30; Ex. 1019 ¶¶ 15–21). Petitioner argues that "[e]xperts for
Petitioners and PO agree that an encryption algorithm is required for
encrypting selected portions of frames." *Id.* (citing Ex. 1003 ¶¶ 75, 115,
159–160; Ex. 1019 ¶ 19; Ex. 1029, 208:18–209:2).

We do not understand Petitioner's position as being one that maps the
claimed frame encryption function to *only* a conventional encryption
algorithm. The background section of the '673 patent discloses that "[v]ideo
data is often encrypted using a symmetric block cipher conforming to, for
example, the Data Encryption Standard (DES) or Advanced Encryption
Standard (AES)." Ex. 1001, 3:31–33. The '673 patent also discloses that

> It may also be desired to apply header and offset
> encryption at a predetermined frequency with respect to each
> frame type. For example, the frequency of application of header
> encryption with respect to i-type frames could assume a value of
> '3', which would mean that header offset encryption would be
> applied to every third frame. In particular implementations the
> application frequency of each type of encryption offset (i.e.,
> header and middle offset) with respect to the various frame types
> can be based upon a function or series. . . . once the encryption
> offset has been generated and stored (step 716), sufficient
> information exists for the frame to be encrypted (step 718). In
> this regard the encryption is effected using the key previously
> stored (step 710) and is conducted over a specified number of
> units of the frame. The number of bytes encrypted may be
> determined based upon the level of available processing power
> and desired degradation of visual quality. Any type of block or
> stream encryption, such as encryption consistent with the Digital

IPR2020-00614
Patent 7,295,673 B2

> Encryption Standard (DES) or Advanced Encryption Standard
> (AES), may be applied to the frame portion encrypted pursuant
> to step 718.

*Id.* at 8:5–30.  Based on these cited portions of the '673 patent, we determine

that the '673 patent does not exclude "conventional" encryption algorithms/

transformations from performing encryption on selected frames and selected

portions of these frames.

*Patent Owner's Arguments Concerning the Claimed
"Synchronized Frame Decryption Stream"*

*Fourth*, Patent Owner contends that Petitioner's proposed

combination does not teach or suggest the claimed "synchronized frame

decryption stream." PO Resp. 31. Specifically, Patent Owner argues that

"*Fetkovich* makes clear, and the Petition does not dispute, that it transmits its

encryption parameters only when the parameters are updated: in *Fetkovich*

'[a] change in encryption method or encryption parameter may be signaled

by an external signal, or the presence of something within the stream itself.'"

*Id.* at 37–38 (citing Ex. 1005, 4:6–8); *accord* Pet. 51 ("Given the

obviousness of sending Ueno's key numbers with each frame, a POSITA

would have similarly been motivated to multiplex Fetkovich's encryption

parameters with each frame because it facilitates Fetkovich's goal of

dynamically-changing encryption parameters."). Patent Owner characterizes

Petitioner as "argu[ing] sending encryption keys with each frame would

have addressed Fetkovich's potential synchronization problems" (*see* Pet.

51), but Patent Owner disputes that the Petition and Dr. McDaniel "explain[]

how or why sending the encryption key with each frame would have

'facilitated' encrypting only selected frames." PO Resp. 39 & n.7 (emphasis

omitted); *see* PO Sur-Reply 20–21.  Patent Owner presents similar

41

IPR2020-00614
Patent 7,295,673 B2

arguments in the context of Petitioner's motivation to combine Ueno,
Fetkovich, and Demos. In its Sur-Reply, Patent Owner contends that
"Petitioner disputes Patent Owner's construction for the first time in the
Reply" and instead "now argues a 'synchronized frame decryption stream'
does not require a 1:1 correspondence" and that the "new position is
untimely."  PO Sur-Reply 16 (citing Pet. Reply 15, 24–25); *see id.* at 17–18,
21–26.

Petitioner responds, as set forth above, that Patent Owner "stated in
district court that frame decryption information is *synchronized* with
encrypted frames by *interleaving* the information with corresponding
frames, e.g., as opposed to appending the information after all video
frames." Pet. Reply 14 (citing Pet. 50; Ex. 1011 ¶ 276 ("Netflix
*synchronizes* the frame decryption information by *interleaving* the PIFF
Sample Encryption Boxes (uuid) and media data, or 'mdat,' boxes
throughout the MP4 file.")).

As discussed above in Section II.B, we did not construe
"synchronized frame decryption stream" to require sending frame decryption
information in a 1:1 correspondence with each frame.  Instead, we
determined above that "Petitioner's position that 'synchronized frame
decryption stream' encompasses *providing* 'one chunk of decryption data to
correspond to several frames' is consistent with the disclosures of the '673
patent." Pet. Reply 25. As set forth above, we are persuaded by Petitioner's
explanation that "[w]hen keys/parameters are only sent when changed, that
'decryption information is used to decrypt each frame' until 'the last frame
before new encryption parameters are received.'" *Id.* (citing Ex. 1003 ¶ 175;
Pet. 42).

IPR2020-00614
Patent 7,295,673 B2

Patent Owner's arguments are not responsive to Petitioner's showing and
accompanying motivation to combine concerning sending a key or frame
decryption information *periodically*. Patent Owner's position is also at odds
with the position taken in its amended district court complaint. *See* Ex. 1011
¶ 276. For the foregoing reasons, Patent Owner's arguments as to why the
combination, and Petitioner's challenge, does not teach or suggest sending
frame decryption information with *each* frame are unavailing.

We also find unavailing Patent Owner's argument that Petitioner's
implicit construction arguments concerning periodically sending keys or
sending keys for a chunk of data is untimely. Petitioner presented this
position *also* in the Petition, as we discuss above in Sections III.A.4.a and
III.A.4.b.

*Fifth*, Patent Owner argues that "[t]he Petition then seems to assume
that interleaving the encryption key in between frames would result in a
synchronized frame decryption stream," but "Petitioner's proposed
motivation to modify *Fetkovich* discussed in the preceding sections would
only apply in a lossy rather than lossless transmission system, and in a lossy
transmission system, interleaving the keys between frames does not
synchronize them with the frames."  PO Resp. 56; *see* PO Sur-Reply 18–19.

Petitioner responds, and we agree, that, "the challenged claims do not
mention channels at all," "[n]or does the specification say anything about
networking protocols, packets, or channels, either lossy or lossless," and
accordingly, "synchronization cannot include requirements about network
delivery or packet ordering." *See* Pet. Reply 16. For this reason, Patent
Owner's argument as to interleaving and lossy/lossless transmission systems
are unavailing.

43

IPR2020-00614
Patent 7,295,673 B2

c)  *Petitioner's Motivation to Combine*

Petitioner contends that "Fetkovich teaches encryption parameters for dynamically controlling the portions of video frames that are encrypted, including sub-frame granularities such as slices and macroblocks," "which were 'granularities for MPEG video data[,]'" "the most popular video standards of the early 2000s." Pet. 23 (alteration in original) (citing Ex. 1005, 3:4–14, 5:29–37); *see id.* (citing Ex. 1003 ¶ 127). According to Petitioner, partially encrypting video data, including by encrypting slices and macroblocks, "can render frames 'almost impossible to comfortably view.'" *Id.* at 23–24 (citing Ex. 1005, 5:29–37, 3:15–40). Petitioner contends that Fetkovich's partial encryption, at sub-frame granularities, "reduces computational requirements while impeding piracy, providing flexible, fine-grain control for the level of security and computation limitations of target platforms, with a scalable mechanism for encrypting selected frames at 'different levels of thoroughness' for different priority levels." *Id.* at 24 (citing Ex. 1005, 3:15–39; Ex. 1003 ¶ 127).

Petitioner takes the position that a "POSITA would . . . have been motivated to apply Fetkovich's partial encryption teachings to selected frames, rather than every frame" and cites Demos for teaching how to select which particular frames are to be encrypted. *Id.* (citing Ex. 1003 ¶ 128). Petitioner ties Demos into the teachings of Fetkovich, noting that, like Fetkovich, Demos acknowledges the confounding effect of encrypting "[s]ub-units of frames," instead of an entire frame. *See* Ex. 1006, 23:38–43, Table 8.

Petitioner contends that Demos teaches encrypting only I and P frames due to their "high influence," which is thus "better for encryption."

44

IPR2020-00614
Patent 7,295,673 B2

Pet. 25 (citing Ex. 1006, 22:53–58, 23:8–24:18, Fig. 11; Ex. 1003 ¶ 130).

"Encrypting only I and P frames provides a large reduction in computational

load *while maintaining protection for all frames*; a POSITA would have

found this advantageous and been motivated to pursue it." *Id.* (emphasis

added). Thus, Petitioner contends that Demos "allows partial encryption of

potentially arbitrary selection of frames, such as important scenes." Pet. 26

(citing Ex. 1003 ¶ 132).

Petitioner contends that, "[g]iven Demos' and Fetkovich's teachings,

a POSITA would have been motivated to use three obvious selections of

frames for partial encryption: (1) I and P frames; (2) every other minute of

frames; or alternatively, (3) frames of particularly important plot or action

scenes." *Id.* at 25 (citing Ex. 1003 ¶ 131).

In Petitioner's view, both Fetkovich and Demos "provide substantial

content protection with reduced computational requirements." *Id.* at 24–25

(citing Ex. 1003 ¶ 129). Petitioner further contends that "[b]eyond

Fetkovich's benefits, this combination would have additional computational

savings by customizing the level of encryption based on the video content

and frames," a benefit expressly disclosed by Fetkovich. *Id.* at 26 (citing

Ex. 1003 ¶ 131), 24 (citing Ex. 1005, 4:30–65).

Petitioner contends that "Demos and Fetkovich teach that keys should

be changed and Ueno provides an elegant, widely-known mechanism for

doing so." *Id.* at 19 (citing Ex. 1003 ¶ 113; Ex. 1006, 24:42–49; Ex. 1005,

3:60–4:5). According to Petitioner, "Fetkovich teaches its encryption

parameters may include an encryption key" and that "[w]hen combined with

Ueno, a POSITA would have been motivated to send key numbers, as taught

by Ueno, instead of actual keys . . . ." *Id.* at 21 (citing Ex. 1005, 3:7–10,

IPR2020-00614
Patent 7,295,673 B2

7:18–22; Ex. 1003 ¶ 118). Petitioner contends that "Ueno's teachings
facilitate key changes, which makes cryptographic attacks more difficult and
limits the impact if a key is compromised." *Id.* (citing Ex. 1004, 2:50–53;
Ex. 1003 ¶ 116). "Ueno changes keys by sending key numbers, rather than
keys themselves, and it allows returning to previous keys in the table, which
can be advantageous with frequent key changes." *Id.* (citing Ex. 1003
¶¶ 114, 116). "Key tables were widely used to store and organize keys,
correlated to key identifiers, which were commonly used to specify the keys
used to encrypt/decrypt data." *Id.* (citing Ex. 1003 ¶¶ 114, 117).

Petitioner contends that "[a] POSITA would have been motivated to
interleave Ueno's key number with Fetkovich's encryption parameters into
the video stream, including for each video frame." Pet. 20 (citing Ex. 1004,
1:37–42, Figs. 4, 6, 17; Ex. 1005, 6:57–61; Pet. §§ VI.A.2[1f–1g]); *see also
id.* at 21 (citing Ex. 1003 ¶¶ 115, 117; Pet. § VI.A.2[1g]) (Petitioner also
contending that "a POSITA would have been motivated to apply Ueno's
teachings regarding key tables and interleaving the active key number within
the video stream, including for every frame"). Petitioner further contends
that "Ueno's framework maintains and restores synchronization, for example
by multiplexing key numbers into the video stream, including for each
frame, which automatically restores synchronization with every frame." *Id.*
at 23 (citing Ex. 1004, 1:32–42, 2:5–9, Fig. 16; Ex. 1003 ¶ 124).

### d) *Analysis of Petitioner's Challenge*

As discussed in Section II.B, we are persuaded by Petitioner's second
alternative position in which Petitioner implicitly construes "synchronized
frame decryption stream" to allow "*one chunk* of decryption data to
correspond to *several frames*." Pet. Reply 24–25 (emphasis added).

IPR2020-00614
Patent 7,295,673 B2

Petitioner explains, and we are persuaded, that "[w]hen keys/parameters are only sent when changed, that 'decryption information is used to decrypt each frame' until 'the last frame before new encryption parameters are received.'" *Id.* (citing Ex. 1003 ¶ 175; Pet. 42). As we do not determine that "synchronized frame decryption stream" requires "a 1:1 synchronized correspondence between decryption information and an encrypted frame," (*supra* § II.B; PO Sur-Reply 16), we need not rely on Petitioner's first alternative position in which Petitioner implicitly construes the term to require the sending of "frame decryption information" with *each* frame.

We are persuaded by Petitioner's motivation to combine based on the contentions set forth above in Section III.A.4.c, which we agree are supported by the cited portions of Fetkovich, Demos, and Ueno and Dr. McDaniel's testimony so as to establish sufficient rational underpinnings. We highlight certain contentions and disclosures cited by Petitioner below.

Fetkovich discloses that "an MPEG stream may be transmitted using varying levels of encryption depending upon the sensitivity of the video material." Pet. 24 (quoting Ex. 1005, 4:61–63). Specifically, Fetkovich discloses that "an MPEG stream can be described in the following units: program, sequence, group of pictures (GOPs), picture, *slice, and macroblock*" and that "dynamic encrypting can occur at any one of these levels." Ex. 1005, 4:38–42 (emphasis added). Demos operates in a manner similar to that of Fetkovich and teaches partial encryption that works on selected frames because it discloses that, in order "to protect a work commercially, not every unit need by [sic] encrypted or confounded by the encryption of a higher-level unit." Pet. 24 (quoting Ex. 1006, 22:39–41).

IPR2020-00614
Patent 7,295,673 B2

We are persuaded that Fetkovich expressly motivates the combination with
Demos because Fetkovich discloses encrypting selected frames instead of all
of them—Petitioner contends, and we agree, "Fetkovich's density parameter
. . . control[s] the percentage of encrypted units and . . . signal[s] when the
frame is not encrypted with a density of 0." *Id.* at 26 (citing Ex. 1005, 5:28–
6:40; Ex. 1003 ¶¶ 131–132).

Demos also expressly motivates a combination with Fetkovich's
partial encryption at sub-frame granularities because Demos discloses that
"an entire frame need not be encrypted to confound some or all of a [Group
of Pictures ('GOP')]" because "[s]*ub-units of frames* may be encrypted and
still have a confounding affect [sic], while reducing encryption and
decryption processing time." Ex. 1006, 23:37–40 (emphasis added). Like
Fetkovich, Demos discloses partial encryption based on, for example,
sensitivity, of the subject matter of a content stream—"a film may be
rendered worthless to pirates if every other minute of film, frames or
particularly important plot or action scenes are encrypted or confounded."
*Id.* at 22:41–44.

Accordingly, we are persuaded that the combination of Fetkovich and
Demos teaches varying degrees of encryption by partially encrypting
selected frames at selected sub-frame granularities, thus providing
computational resource savings and customizable security depending on the
sensitivity and/or security requirements of the subject matter of the content
stream.

We are also persuaded that Fetkovich motivates a combination with
Ueno as Fetkovich discloses that "its encryption parameters may include an
encryption key" (Pet. 21 (citing Ex. 1005, 3:7–10, 7:18–22)) and Ueno

IPR2020-00614
Patent 7,295,673 B2

discloses that "input data D enciphered by the data enciphering section 11,
the cipher key number N(ks) output from the cipher key number sending
section 14 and multiplexed at the multiplexing section 15, and frame
synchronizing signals F." Ex. 1004, 2:1–5. Ueno also discloses that "[t]he
cipher key number N(ks) is usually transmitted *only when it has been
changed*; in some cases, the cipher key number is transmitted *at the start of
data communication* or *at regular intervals*, or is transmitted with each of
frames." *Id.* at 2:5–9 (emphasis added). Thus, we are persuaded that "[a]
POSITA would have been motivated to interleave Ueno's key number with
Fetkovich's encryption parameters into the video stream . . . ." Pet. 20
(citing Ex. 1004, 1:37–42, Figs. 4, 6, 17; Ex. 1005, 6:57–61; Pet.
§§ VI.A.2[1f–1g]).  As such, we find Petitioner's motivation to combine
Ueno and Fetkovich sufficiently supported by rational underpinnings.

Petitioner asserts that "[a] POSITA would have had a reasonable
expectation of success when combining the reference[s'] teachings because
they were well-known aspects of video streaming, used for their known
purposes in a complimentary manner." *Id.* at 27 (citing Ex. 1003 ¶ 139); *id.*
at 27–28 (citing Pet. §§ I, IV; Ex. 1009, 1:49–63, 2:1–8, 8:23–32; Ex. 1003
¶¶ 139–140; Ex. 1004, 1:21–22). Petitioner further contends, and we agree,
that

> [a] POSITA would have found the combination to be
> routine, predictable, and well within the level of ordinary skill.
> The references are directed to similar techniques. Fetkovich and
> Demos both teach partial encryption based on "units" including
> frames, slices, and macroblocks. *See* Fetkovich and Ueno teach
> similar, flexible frameworks for dynamically changing
> encryption parameters including by multiplexing parameters into
> the video stream.

49

IPR2020-00614
Patent 7,295,673 B2

> The alleged invention is a combination of familiar
> elements (e.g., partial video encryption, key tables, and
> multiplexed encryption information) according to known
> methods (e.g., partially encrypting video using a key table and
> then multiplexing encryption information into the video stream)
> to yield predictable results (e.g., a partially-encrypted streaming
> video system with decryption information).

*Id.* at 28 (citing *KSR*, 550 U.S. at 401; Ex.1003 ¶¶ 140–142; Ex. 1004, 1:67–
2:9; Ex. 1005, 3:4–14, 5:29–33, 6:49–65, Figs. 1, 2; Ex. 1006, 23:8–24:18,
Fig. 11). Petitioner contends, and we are persuaded, that "[a]ll of these
components were already used for streaming video years before the '673
patent." *Id.*

For all of the foregoing reasons, we are persuaded that one of ordinary
skill in the art would have been motivated to combine Ueno, Fetkovich, and
Demos as proposed by Petitioner and would have had a reasonable
expectation of success in so doing.

### e) *Objective Indicia of Non-Obviousness*

Objective indicia of nonobviousness (also referred to as secondary
considerations) may include long-felt but unsolved need, failure of others,
unexpected results, commercial success, copying, licensing, industry praise,
and expert skepticism. *Mintz v. Dietz & Watson, Inc.*, 679 F.3d 1372, 1379
(Fed. Cir. 2012). Objective indicia are "only relevant to the obviousness
inquiry 'if there is a nexus between the claimed invention and the [objective
indicia of nonobviousness].'" *In re Affinity Labs of Tex., LLC*, 856 F.3d
883, 901 (Fed. Cir. 2017) (quoting *Ormco Corp. v. Align Tech., Inc.*, 463
F.3d 1299, 1312 (Fed. Cir. 2006)); *see also ClassCo, Inc. v. Apple, Inc.*, 838
F.3d 1214, 1220 (Fed. Cir. 2016). As the Federal Circuit explained, "a
patentee is entitled to a rebuttable presumption of nexus between the

IPR2020-00614
Patent 7,295,673 B2

asserted evidence of secondary considerations and a patent claim if the patentee shows that the asserted evidence is tied to a specific product and that the product 'is the invention disclosed and claimed.'" *Fox Factory, Inc. v. SRAM, LLC*, 944 F.3d 1366, 1373 (Fed. Cir. 2019), *cert. denied*, 141 S. Ct. 373 (2020) (quoting *Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1392 (Fed. Cir. 1988)). That is, presuming nexus is appropriate "when the patentee shows that the asserted objective evidence is tied to a specific product and that product 'embodies the claimed features, and is coextensive with them.'" *Id.* (*quoting Polaris Indus., Inc. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1072 (Fed. Cir. 2018)). On the other hand, the patentee is not entitled to a presumption of nexus if the patented invention is only a component of a commercially successful machine or process. *Id.* (reaffirming the importance of the "coextensiveness" requirement).

Applying *Fox Factory*, the Board uses a two-step analysis in evaluating nexus between the claimed invention and the evidence of secondary considerations. *Lectrosonics, Inc. v. Zaxcom, Inc.*, IPR2018-01129, Paper 33 at 33 (PTAB Jan. 24, 2020) (precedential). We first consider whether a patent owner has demonstrated "that its products are coextensive (or nearly coextensive) with the challenged claims," resulting in a rebuttable presumption of nexus. *Id.* at 33.

Here, as Petitioner correctly argues, Patent Owner "introduces evidence of DivX's products but does not argue secondary considerations or make any effort to argue nexus."[6] Pet. Reply 26. Petitioner further argues

---

[6] Patent Owner did not characterize any of the arguments or evidence presented in its Patent Owner's Response as objective indicia of non-obviousness and only did so when questioned during oral argument. *See* Tr.

IPR2020-00614
Patent 7,295,673 B2

that Patent Owner "is not entitled to a presumption of nexus when the
claimed features constitute a small part of the claimed product and are far
from coextensive." *Id.*  Patent Owner asserts and Dr. Nielsen testifies that
"DivX implemented its inventive partial encryption [method or approach]
into DivX's Digital Right Management Systems" and each cite to
Exhibit 2020, a claim chart comparing challenged claims 1, 2, 4, 5, 10, 14,
and 17–19 of the '673 patent to features of DivX's Decoder Software
Development Kit (SDK). PO Resp. 11; Ex. 2008 ¶ 61. Patent Owner does
not assert or explain that it is arguing secondary considerations of non-
obviousness, does not attempt to establish a nexus between the claimed
features and Patent Owner's commercial product, and does not discuss or
explain Exhibit 2020 in *any* level of detail. *See generally* PO Resp.; *see also*
Pet. Reply 26 n.15 (citing Ex. 1029, 131:25–132:20) (Petitioner arguing that
"Exhibit 2020 was not prepared by an expert witness or discussed in
briefing"). For these reasons, we determine that a presumption of nexus is
inappropriate here—Patent Owner does not provide an analysis
demonstrating that its product(s) are coextensive (or nearly coextensive)
with the challenged claim. *See Lectrosonics*, Paper 33 at 33. As such, we
proceed to the second step of the analysis under *Fox Factory*.

Even without the presumption, a patent owner "is still afforded an
opportunity to prove nexus by showing that the evidence of secondary
considerations is the 'direct result of the unique characteristics of the
claimed invention,'" in the second step of the analysis. *Fox Factory*, 944

---

72–77 (Patent Owner's counsel responding to the panel's questioning on
whether Patent Owner intended to argue secondary considerations or nexus
in its briefing).

IPR2020-00614
Patent 7,295,673 B2

F.3d at 1373–74 (quoting *In re Huang*, 100 F.3d 135, 140 (Fed. Cir. 1996)).
Also, the nexus must be "to some aspect of the claim not already in the prior
art." *In re Kao*, 639 F.3d 1057, 1069 (Fed. Cir. 2011). Once a patent owner
has presented a prima facie case of nexus, the burden of coming forward
with evidence in rebuttal shifts to the challenger to adduce evidence showing
that the objective indicia was due to extraneous factors other than the
patented invention. *Demaco*, 851 F.2d at 1392–93. "Ultimately, the fact
finder must weigh the [objective indicia] evidence presented in the context
of whether the claimed invention as a whole would have been obvious to a
skilled artisan." *Lectrosonics*, IPR2018-01129, Paper 33 at 33 (citing *WBIP,
LLC v. Kohler Co.*, 829 F.3d 1317, 1331–32 (Fed. Cir. 2016)).

Patent Owner presents evidence of secondary considerations that
appears to generally address at least: industry-wide praise and/or licensing;
commercial success; and failure of others.  With regard to the second step of
the analysis under *Fox Factory*, Patent Owner's evidence of secondary
considerations is not shown to be the "direct result of the unique
characteristics of the claimed invention" and Patent Owner does not prove
nexus without the presumption, for the reasons discussed below. *Fox
Factory*, 944 F.3d at 1373–74.

Patent Owner contends that the '673 patent discloses a "unique
approach to partial frame encryption" that is "incorporated into DivX's
Digital Rights Management ('DRM') [product] [and] licensed and adopted
for video codecs around the world." PO Resp. 1 (citing Ex. 2006, 1–2; PO
Resp. § 2). Patent Owner asserts that DivX's DRM product, using the
partial frame encryption method taught by the '673 patent, has been
deployed in over one billion consumer devices, protects over 43,000

IPR2020-00614
Patent 7,295,673 B2

professional titles, and that "major consumer electronics manufacturers such
as LG and Samsung have paid hundreds of millions of dollars to license
DivX's Software Development Kit, including this DRM [product] practicing
the invention." *Id.* (citing Ex. 2006, 1–2); *see also id.* at 11 (citing Ex. 2006,
2–3). Exhibit 2006 is a document describing DivX's revenue growth for
certain categories of licensing, the size of its customer base, particularly in
terms of usage and installation, and the size of its content library, as well as
general areas of predicted expansion or growth.  At its most specific,
Exhibit 2006 describes the number of files protected by DRM, DRM content
delivery, and the deployment and adoption of DRM. Neither Exhibit 2006
nor Patent Owner's arguments explain how we might interpret this
document to show, for example, that its licensing activity is due to the
particular portion of DRM that specifies the claimed partial frame
encryption invention. Stated differently, there is insufficient support for the
proposition that consumer electronics manufacturers, including LG,
Samsung, or any other entity, licensed DivX's DRM product *because of* the
partial frame encryption method recited in the claims. If indeed the
invention(s) claimed in the '673 patent is/are incorporated in the DRM that
is included in DivX's Software Development Kit, there is no evidence that
any of the installation, deployment, and growth numbers are due to the
claimed partial frame encryption invention of claim 1 (or any other
challenged claim).

Patent Owner contends that "prior to the claimed invention there was
a string of failed attempts to achieve efficient access protection without fully
encrypting compressed video" and cites a 1996 "IEEE experimental study"
that "tested, and rejected, numerous 'previously proposed selective

IPR2020-00614
Patent 7,295,673 B2

encryption schemes for MPEG video security.'"  PO Resp. 3–4 (citing
Ex. 2017, 1–5).[7] According to Patent Owner, "DivX players achieved wide
adoption because they could be used on codecs utilizing limited-power
consumer device processors of the time, where the processing demands of
decrypting the DivX encrypted frames could be restricted so as not to exceed
these components' 'peak processing power.'" *Id.* at 6 (citing Ex. 1001,
10:29–34; PO Resp. § II.C); *see also id.* at 6 (citing Ex. 2017, 8); *id.* at 8
(citing Ex. 2017, 3).

    As to Patent Owner's purported evidence of failure of others,
Petitioner contends that "PO only considers a single paper from 1996 (Agi,
Ex. 2017), shortly after the development of partial encryption was
kickstarted by a famous 1995 paper (Spanos and Maple)." Pet. Reply 27
(citing Ex. 1003 ¶ 67; Ex. 1008). Petitioner asserts that "[b]y 2002,
POSITAs knew many partial encryption techniques." *Id.* (citing Ex. 1003
¶ 68; Ex. 1007; Ex. 1009). According to Petitioner, Patent Owner "did not
consider the developments in the six years after [the] Agi [Study]" and "did
not dispute, or even address, that a POSITA knew how to use partial
encryption in 2002." *Id.* (citing Pet. 17).

    In the Agi Study, the authors "conducted an experimental study of . . .
proposed selective encryption schemes for MPEG video security."
Ex. 2017, Abstract. The authors determined that the studied selective
encryption schemes "were inadequate for sensitive applications." *Id.* The
paper discusses "the tradeoffs between levels of security and computational

---

[7] Exhibit 2017 ("Agi Study") is a paper by Agi et al., "An Empirical Study
of Secure MPEG Transmission" in the *ISOC Symposium on Network and
Distributed System Security*, San Diego, CA (Feb. 1996).

IPR2020-00614
Patent 7,295,673 B2

and compression efficiency." *Id.* In the study, the authors studied "a selective encryption algorithm [that] encrypts only I-frames of MPEG video." *Id.* at 3. The authors determined that "MPEG video cannot be secured by simply encrypting the encoded I-frames." *Id.* at 5. But they also determined that "simple selective encryption may be sufficient for certain applications, such as cable television broadcast of pay channels, where quality of service supersedes high security as the driver." *Id.* The authors also experimented with encrypting I-blocks along with I-frames, as well as encrypting P-frames. *Id.* The authors sought to improve security, for example, "by increasing the I-frame frequency" at the expense of "increased video size, a higher network bandwidth consumption, and higher computational complexity for encryption and decryption." *Id.* at 8.

While the Agi Study explains the tradeoffs between security and resources consumed, it does not indicate that selective encryption does not work, or fails, when applied to frames and/or blocks of MPEG video. Although the studied selective encryption techniques were insufficiently secure for some applications (e.g., presentations on business finances), they were sufficiently secure for less sensitive applications (e.g., pay-per-view television)—the selective encryption techniques did not fail for all applications. As such, we do not discern that Exhibit 2017 evidences a failure that would tend to support Patent Owner's arguments concerning non-obviousness. We also are persuaded by Petitioner's arguments that Patent Owner's discussion and Exhibit 2017 are not contemporaneous with the earliest priority date of the '673 patent. Patent Owner does not present evidence that selective encryption techniques were stagnant in the six

IPR2020-00614
Patent 7,295,673 B2

intervening years between the publication of the Agi Study in 1996 and the
earliest possible priority date of the '673 patent, 2002.

Patent Owner contends that "DivX implemented its inventive partial
encryption approach into DivX's Digital Right Management Systems," and
that "DivX developer kits specifically highlighted the invention's benefits,
touting for example the fact that developers could cap the processing power
needs of a DivX encrypted video based on manufacturer limits."  PO
Resp. 11 (citing Ex. 2008 ¶ 61; Ex. 2020; Ex. 2004, 1267 ("Amount of
decryption is bounded and deterministic to give consistent and low
performance overhead.")); *see* Ex. 2004, 1280.  Patent Owner asserts that the
benefit of capping processor power needs "was possible because DivX's
method could specify, *e.g.*, the layout and offset of bytes encrypted in each
frame, unlike partial encryption schemes like those in *Fetkovich* and
*Demos*." PO Resp. 11. According to Patent Owner, "DivX developer kits
also highlighted that DivX DRM could be used by components already in
devices." *Id.* (citing Ex. 2005, 1248 ("technology provided by the SDK is
intended to be ported to an embedded environment or consumer device")).

Exhibit 2004, which describes DivX's DRM Software Development
Kit, lists that the "[a]mount of decryption is bounded and deterministic to
give consistent and low performance overhead" in a list of fourteen
"Requirements and Parameters." Ex. 2004, 1666–67. It also states that
"DivX Certification defines the configuration of AES" and "defines how
much of [a] frame is to be encrypted." *Id.* at 1280. Exhibit 2004 further
states that "[i]t is a fixed amount for each frame, which keeps processing
bounded and consistent."  *Id.*  Even if any of the quoted "Requirements and
Parameters" or "benefits" are due solely to the claimed partial frame

IPR2020-00614
Patent 7,295,673 B2

encryption method of the '673 patent, there is no evidence that consumers or users of the SDK purchased, licensed, or used the DRM product because of these particular benefits.  For example, users may have purchased or used the product due to any other of the fourteen "Requirements and Parameters." Exhibit 2005, which describes DivX's Decoder SDK, states that the "technology provided by the SDK is intended to be ported to an embedded environment or consumer device." Ex. 2005, 1248. Similarly, it is not clear how this statement relates to the claimed partial frame encryption method. To the extent the quoted statements in Exhibits 2004 and 2005 could be considered praise, they are not supportive of Patent Owner's position because they constitute self-serving praise, if they can be considered that, and not industry-wide praise, from peers or leaders in similar industries.

For the reasons discussed above, we are not persuaded that Patent Owner has met its burden to establish a nexus between the claimed invention and the submitted evidence relating to industry-wide praise and licensing, commercial success, as well as failure of others. Absent a nexus, we determine that Patent Owner's evidence of objective indicia does not weigh in favor of non-obviousness.

f)      *Weighing the* Graham *Factors*

"Once all relevant facts are found, the ultimate legal determination [of obviousness] involves weighing of the fact findings to conclude whether the claimed combination would have been obvious to an ordinary artisan." *Arctic Cat Inc. v. Bombardier Recreational Prods. Inc.*, 876 F.3d 1350, 1361 (Fed. Cir. 2017). Above, based on full record before us, we provide our factual findings regarding (1) the level of ordinary skill in the art, (2) the scope and content of the prior art, (3) any differences between the claimed

58

IPR2020-00614
Patent 7,295,673 B2

subject matter and the prior art, and (4) objective evidence of nonobviousness.

In particular, we find that (1) Petitioner's proposed level of ordinary skill in the art is consistent with the prior art of record (*supra* § I.h); (2) Ueno, Fetkovich, and Demos teach each of the limitations of independent claim 1 (*supra* § III.A.4.a); (3) one of ordinary skill in the art would have had a reason with rational underpinning to combine Ueno, Fetkovich, and Demos and would have had a reasonable expectation of success in so doing (*supra* §§ III.A.4.c, III.A.4.d); and (4) there is insufficient demonstration of nexus to objective evidence of nonobviousness in the record (*supra* § III.A.4.e).

Weighing these findings with our determinations of the level of ordinary skill and objective evidence of nonobviousness in the record, a preponderance of the evidence persuades us that independent claim 1 of the '673 patent is unpatentable over Ueno, Fetkovich, and Demos.

### 5.   *Independent Claim 14*

#### a)   *Petitioner's Element-by-Element Analysis*

With respect to claim 14 and its recitation of "frame decryption function," Petitioner primarily relies on its analysis with respect to claim 1 as to how the combination of Ueno, Fetkovich, and Demos teaches or suggests the "frame encryption function."

> *[14a] A method for decrypting a protected stream of*
> *compressed video content comprising:*

Petitioner contends that "Demos teaches a method for decrypting . . . a protected stream of compressed video content." Pet. 68 (citing Ex. 1006, 28:10–13; Ex. 1003 ¶ 235).  Petitioner further contends that Fetkovich

IPR2020-00614
Patent 7,295,673 B2

"teaches decrypting a protected stream of compressed video content." *Id.*
(citing Ex. 1005, 2:11–12, 6:66–7:7, Fig. 1; Ex. 1003 ¶ 236).  Having
reviewed the cited portions of Demos and Fetkovich and the accompanying
testimony of Dr. McDaniel, we are persuaded that the combination of Ueno,
Fetkovich, and Demos—in particular, Demos and Fetkovich—teaches the
subject matter of the preamble of claim 14. We need not determine whether
the preamble is limiting as Petitioner sufficiently shows that the combination
teaches the subject matter of the preamble.

> *[14b] receiving an input stream of compressed video*
> *content containing encrypted frames and unencrypted*
> *frames;*

Petitioner contends that "Ueno teaches sending the protected stream to
a receiver, which therefore receives an input stream of compressed video
content containing encrypted frames and unencrypted frames."  Pet. 70
(citing Ex. 1004, 4:20–30, 1:44–52, 4:60–5:14, 6:60–67, Figs. 1, 2, 5, 16;
Ex. 1003 ¶ 239).

Petitioner further contends that "Demos . . . teaches decrypting the
protected stream of compressed video content by an authorized decryption
system, which obviously receives an input stream of compressed video
content containing encrypted and unencrypted frames." *Id.* (citing Ex. 1006,
28:10–13, 3:25–30). According to Petitioner, "[a] POSITA would have
found it obvious that the authorized decryption system (e.g., a client) first
receives the protected video stream before it can decrypt it." *Id.* (citing
Ex. 1003 ¶ 240).

Petitioner still further contends that "Fetkovich further teaches that a
receiver receives the protected stream of video content." *Id.* at 71 (citing
Ex. 1005, 6:66–7:7, Fig. 1; Ex. 1003 ¶ 241); *see id.* (citing Ex. 1003 ¶ 242).

IPR2020-00614
Patent 7,295,673 B2

We are persuaded by Petitioner's contentions, the cited portions of
Ueno, Demos, and Fetkovich, and Dr. McDaniel's testimony that the
combination of Ueno, Fetkovich, and Demos teaches limitation [14b].

> *[14c] receiving frame decryption information*
> *necessary to decrypt said encrypted frames, said*
> *frame decryption information is synchronized with*
> *said set of encrypted frames into a synchronized*
> *frame decryption stream and distinguishes said*
> *encrypted frames from said unencrypted frames;*

Petitioner contends that the combination of Ueno, Fetkovich, and
Demos "teaches or suggests that the synchronized frame decryption stream
includes encryption status information corresponding to each frame of said
protected stream, which indicates whether each frame is encrypted or not . . .
and thereby distinguishes the encrypted frames from the unencrypted frames
of the protected stream." Pet. 72 (citing Pet. § VI.A.4; Ex. 1003 ¶ 244).

Petitioner alternatively contends Demos

> teaches that the frame decryption information distinguishes
> encrypted frames from unencrypted frames to aggregate a
> number of similar encrypted portions (e.g., DC or AC
> coefficients) and decrypt them as a group, "for an entire frame"
> which can facilitate parallel decryption. To do so, a POSITA
> would have found it obvious to utilize information identifying
> encrypting frames and portions of frames, which distinguishes
> encrypted frames from unencrypted frames. Attempting
> decryption without this type of information would have been
> computationally infeasible for video streaming; thus Demos
> renders this limitation obvious.

*Id.* (citing Ex. 1006, 24:20–40, 25:31–35; Ex. 1003 ¶¶ 245, 246). According
to Petitioner "Demos teaches partially encrypting selected video frames,
including encrypting every other minute or potentially arbitrary selections
such as frames from important scenes," and that, "[t]o decrypt such a video,

61

IPR2020-00614
Patent 7,295,673 B2

it would have been obvious for the frame decryption information to distinguish encrypted from unencrypted frames with encryption status information." *Id.* at 73 (citing Pet. §§ VI.A.4, VI.A.1, VI.A.2[1d]; Ex. 1006, 22:29–44; Ex. 1003 ¶ 247).

We are persuaded by Petitioner's contentions, the cited portions of Demos, and Dr. McDaniel's testimony that the combination of Ueno, Fetkovich, and Demos teaches limitation [14c].

> *[14d] obtaining an applicable frame decryption key*
> *from the received frame decryption information; and*

Petitioner contends that "Ueno further teaches extracting the key number from the received frame encryption information and using it to obtain the key that was used to encrypt the particular frame." Pet. 73 (citing Ex. 1004, 1:44–52). Petitioner further contends that "[t]he combination teaches the use of symmetric encryption, meaning the encryption key is also the decryption key." *Id.* at 74 (citing Pet. § VI.A.5 (claim 4); Ex. 1001, 8:62–67, Fig. 8 (step 830)); *see id.* (citing Ex. 1003 ¶¶ 249, 250).

We are persuaded by Petitioner's contentions, the cited portions of Ueno, and Dr. McDaniel's testimony that the combination of Ueno, Fetkovich, and Demos teaches limitation [14d].

> *[14e] decrypting selected portions of said encrypted*
> *frames using a frame decryption function in*
> *accordance with said frame decryption information,*
> *which identifies the specific portions of the frames to*
> *be decrypted and the applicable frame decryption key*
> *from the frame decryption information.*

Petitioner contends that Ueno, Fetkovich, and Demos teach "the inverse operation of decrypting the selected (encrypted) portions of encrypted frames using frame decryption information that identifies the

62

IPR2020-00614
Patent 7,295,673 B2

specific portions of the frames to be decrypted (e.g., through the encryption parameters) and the applicable frame decryption key (e.g., through the key number)." Pet. 76–77 (citing Ex. 1005, 6:66–7:7, 2:23–42, 3:4–15; Pet. § VI.A.1; Ex. 1003 ¶ 252). Petitioner further contends that "[e]ncryption parameters for granularity, density scale, density, and delay control the partial encryption process and identify the specific portions of the frames that are encrypted—and thus need to be decrypted." *Id.* at 77 (citing Pet. § VI.A.2[1d] (explaining Fetkovich's encryption parameters); *see id.* (citing Ex. 1005, 6:24–40; Ex. 1003 ¶ 253).

Petitioner alternatively contends that "Ueno teaches decrypting the encrypted frames using frame decryption information that includes a key number identifying the applicable frame decryption key." *Id.* (citing Ex. 1004, 1:44–52 ("The receiver 2 includes a separating section 21 for . . . separating the received data into enciphered data and a cipher key number, . . . and a data deciphering section 24 for *deciphering the separated enciphered data by means of a cipher key ks specified by the cipher key number N(ks)'*." (emphasis added)), 1:67–2:9, 5:33–44, 4:60–5:14, 6:60–67, Figs. 1, 2, 5, 16).

As yet another alternative, Petitioner contends that "Demos further renders this limitation obvious." Pet. 78 (citing Ex. 1006, 28:10–13 ("For decompression, *the relevant key(s) would be applied to decrypt the data stream*." (emphasis added)), 25:31–35; Ex. 1003 ¶ 255); *see id.* (citing Pet. §§ VI.A.1, VI.A.2[1c-1d], VI.A.11[14d]; Ex. 1003 ¶¶ 254–256).

According to Petitioner, "[t]he references further teach decrypting selected portions of encrypted frames using a frame decryption function in accordance with the frame decryption information," and that, as an example,

IPR2020-00614
Patent 7,295,673 B2

"the references teach using symmetric algorithms for decrypting the selected portions of encrypted frames in accordance with the frame decryption information, as explained above." *Id.* at 78 (citing Ex. 1003 ¶ 257; Ex. 1004, 1:16–20; Ex. 1005, 6:52–56; Ex. 1006, 27:65–28:1; Pet. §§ VI.A.1, VI.A.5 (claim 4)).

We are persuaded by Petitioner's contentions, the cited portions of Ueno, Demos, and Fetkovich, and Dr. McDaniel's testimony that the combination of Ueno, Fetkovich, and Demos teaches limitation [14e].

Petitioner relies on the same motivation to combine as set forth for independent claim 1 (*supra* § III.A.4.b), which we find persuasive and supported by sufficient rational underpinnings for the reasons set forth in Section III.A.4.c. Accordingly, we are persuaded that Petitioner establishes unpatentability of claim 14 over the combination of Ueno, Fetkovich, and Demos by a preponderance of the evidence.

b)     *Weighing the* Graham *Factors*

Based on full record before us, we provide our factual findings regarding (1) the level of ordinary skill in the art, (2) the scope and content of the prior art, (3) any differences between the claimed subject matter and the prior art, and (4) objective evidence of nonobviousness. Similar to our discussion above in Section III.A.4.f with respect to independent claim 1, we find that (1) Petitioner's proposed level of ordinary skill in the art is consistent with the prior art of record (*supra* § I.H); (2) Ueno, Fetkovich, and Demos teach each of the limitations of independent claim 14 (*supra* § III.A.5.a); (3) one of ordinary skill in the art would have had a reason with rational underpinning to combine Ueno, Fetkovich, and Demos would have had a reasonable expectation of success (*supra* §§ III.A.4.c, III.A.4.d); and

IPR2020-00614
Patent 7,295,673 B2

(4) there is insufficient demonstration of nexus to objective evidence of nonobviousness in the record (*supra* § III.A.4.e).

Weighing these findings with our determinations of level of ordinary skill and objective evidence of nonobviousness in the record, a preponderance of the evidence persuades us that independent claim 14 of the '673 patent is unpatentable over Ueno, Fetkovich, and Demos.

Our weighing of the *Graham* factors set forth in this Section and in Section III.A.4.f applies to dependent claims 2–6, 9, 10, 13, and 15–19 and is adopted, but not repeated, in Sections III.A.6–III.A.12.

### 6.   *Dependent Claim 2*

Claim 2 depends from claim 1 and further recites "wherein said synchronized frame decryption stream includes references to frame encryption keys in the key table."  Ex. 1001, 11:61–63.

Petitioner contends that "Ueno teaches generating frame decryption information that includes key numbers that are references to frame encryption keys stored in the key table." Pet. 52 (citing Ex. 1004, 1:53–57, 1:43–52, 5:15–32, 4:45–49, 6:54–59). Petitioner also contends "Ueno further teaches that a receiver of a data stream identifies a key to be used to decrypt a portion of the data stream based on the key number accompanying the data stream." *Id.* (citing Ex. 1004, 1:57–64, 5:39–44, 6:60–67). Petitioner that, accordingly, "[i]t would have been obvious for these keys to be used for partially encrypting video frames, and thus a POSITA would have understood them to be frame encryption keys stored in the key table." *Id.* at 53 (citing Pet. §§ VI.A.2[1c-1d], VI.A.1).

IPR2020-00614
Patent 7,295,673 B2

We are persuaded by Petitioner's contentions and the cited portions of Ueno that the combination of Ueno, Fetkovich, and Demos teaches the limitation recited in claim 2.

Petitioner relies on the same motivation to combine as set forth for independent claim 1 (*supra* § III.A.4.b), which we find persuasive and supported by sufficient rational underpinnings for the reasons set forth in Section III.A.4.c. Accordingly, we are persuaded that Petitioner establishes unpatentability of claim 2 over the combination of Ueno, Fetkovich, and Demos by a preponderance of the evidence.

### 7. *Dependent Claims 3 and 16*

Claim 3 depends from claim 1 and further recites, "wherein said synchronized frame decryption stream includes encryption status information corresponding to each frame of said protected stream." Ex. 1001, 11:64–67. Claim 16 depends from claim 14 and recites limitations similar to those recited in claim 3.

Petitioner contends that "[a] POSITA would [] have found it obvious to use Fetkovich's density parameter to indicate an encryption status for each frame, where a density of 0 indicates the frame is unencrypted, and non-zero density values indicate the frame is partially encrypted." Pet. 55 (citing Pet. §§ VI.A.1, VI.A.2[1d]; Ex. 1003 ¶¶ 132, 156, 196); *see id.* at 79–80 (addressing claim 16).

We are persuaded by Petitioner's contentions, the cited portions of Fetkovich, and Dr. McDaniel's testimony that the combination of Ueno, Fetkovich, and Demos teaches the limitations recited in claims 3 and 16.

Petitioner relies on the same motivation to combine as set forth for independent claim 1 (*supra* § III.A.4.b), which we find persuasive and

IPR2020-00614
Patent 7,295,673 B2

supported by sufficient rational underpinnings for the reasons set forth in
Section III.A.4.c. Accordingly, we are persuaded that Petitioner establishes
unpatentability of claims 3 and 16 over the combination of Ueno, Fetkovich,
and Demos by a preponderance of the evidence.

### 8.   *Dependent Claims 4 and 17*

Claim 4 depends from claim 1 and recites, "wherein said
synchronized frame decryption stream includes a reference to a decryption
key in the key table." Ex. 1001, 12:1–3. Claim 17 depends from claim 14
and recites substantially similar features: "wherein said synchronized frame
decryption stream includes a reference to a frame decryption key for each of
said encrypted frames." *Id.* at 13:6–8.

According to Petitioner, "Ueno's teaching regarding key numbers
includes references to both encryption keys and decryption keys in key
tables, where the transmitter and receiver have the 'same contents' in their
key tables, and the key numbers that are multiplexed into the data stream
reference keys for decryption." Pet. 56 (citing Ex. 1004, 1:32–57, 4:60–5:1,
5:33–44, 6:60–65; Ex. 1003 ¶ 200). Petitioner further contends that "[a]
POSITA would have understood DES, Triple DES, Blowfish, FEAL, and
AES to be symmetric encryption algorithms, meaning the same key is used
for encryption and decryption" and "[t]hus the frame encryption key taught
by the combination is obviously the same as the frame decryption key." *Id.*
(citing Ex. 1003 ¶¶ 199–200; *see id.* (citing Ex. 1004, 1:13–20 (teaching
DES and FEAL algorithms)); Ex. 1006, 27:65–28:1; Ex. 1005, 6:52–56
("Any conventional encryption technique can be employed within
encryption unit 20 ......."); Pet. §§ IV, VI.A.1, n.3).

IPR2020-00614
Patent 7,295,673 B2

We are persuaded by Petitioner's contentions, the cited portions of
Ueno, Fetkovich, and Demos, and Dr. McDaniel's testimony that the
combination of Ueno, Fetkovich, and Demos teaches the limitations recited
in claims 4 and 17.

Petitioner relies on the same motivation to combine as set forth for
independent claim 1 (*supra* § III.A.4.b), which we find persuasive and
supported by sufficient rational underpinnings for the reasons set forth in
Section III.A.4.c. Accordingly, we are persuaded that Petitioner establishes
unpatentability of claims 4 and 17 over the combination of Ueno, Fetkovich,
and Demos by a preponderance of the evidence.

9.    *Dependent Claims 5, 6, 9, and 18*

Claim 5 depends from claim 1 and further recites "wherein said
synchronized frame decryption stream includes intra-frame encryption offset
information corresponding to each encrypted frame of said protected
stream." Ex. 1001, 12:4–7. Claim 18 depends from claim 14 and recites
substantially similar limitations.

Petitioner contends that the "combination teaches partially encrypting
portions of selected frames based on encryption parameters that are included
as synchronized frame decryption information for each frame, which is part
of the synchronized frame decryption stream." Pet. 56–57 (citing Pet.
§§ VI.A.2[1d–1g]; Ex. 1003 ¶ 202). Petitioner further contends that "[t]he
encryption parameters include granularity, which selects the encryption unit
such as a slice or macroblock, and delay, which 'refers to the number of
encryption units to wait before encrypting the first one'" and that the "delay
and granularity parameters control the offset within each frame before
encryption begins." *Id.* at 57 (citing Ex. 1005, 5:29–59; Ex. 1003 ¶ 203).

IPR2020-00614
Patent 7,295,673 B2

We are persuaded by Petitioner's contentions, the cited portions of
Fetkovich, and Dr. McDaniel's testimony that the combination of Ueno,
Fetkovich, and Demos teaches the limitations recited in claims 5 and 18.

Patent Owner contends that "*Fetkovich*'s 'delay' parameter, cited by
Petitioner is not a per frame delay." PO Resp. 60 (citing Ex. 1005, 5:59–60).
More particularly, Patent Owner contends that "[a] delay of, for example, 1
in *Fetkovich* does not mean that encryption is delayed by one unit in each
frame; it merely means encryption is delayed at the beginning of the overall
encryption process." *Id.* Therefore, according to Patent Owner,
"*Fetkovich*'s 'delay' parameter is not a 'per frame' delay." *Id.* (citing Ex.
2008 ¶ 145). Patent Owner also contends that, "even if Fetkovich's delay
was a per-frame delay, its 'granularity' dictating the amount of delay would
not be a byte offset as required by the Claims" because "*Fetkovich*'s
granularity is based on frame sub-structure, e.g., slice or frame or GOP." *Id.*
(citing Ex. 1005, 5:29–33; Pet. § II.B).

With respect to Patent Owner's argument that "*Fetkovich*'s 'delay'
parameter . . . is not a per frame delay" (*see* PO Resp. 60), Petitioner
responds, and we agree, that "the combination relies on *Demos'* teaching for
frame-based encryption." Pet. Reply 25. Petitioner contends, and we agree,
that "combin[ing] Demos' selection of frames with Fetkovich's sub-frame
encryption' by selecting frames, as Demos teaches, and then applying
Fetkovich's encryption parameters with sub-frame granularity . . . results in
a per-frame offset" and further, that "[t]he claims do not require a byte
offset." *Id.* at 26 (citing Ex. 1003 ¶ 131; Pet. Reply § I).

Claim 6 depends from claim 5 and further recites, "further including
parsing said input stream in order to determine frame boundaries and frame

69

IPR2020-00614
Patent 7,295,673 B2

types associated with frames of said sequence of frames." Ex. 1001, 12:8–11.

Petitioner contends that "Demos teaches selecting frames for partial encryption based on frame type, particularly I and P frames." Pet. 58 (citing Pet. §§ VI.A.1, VI.A.2[1d]). Petitioner further contends that "it would have been obvious to parse the input stream to determine frame boundaries and frame types (e.g., I, P, or B-frames) associated with frames of said sequence of frames." *Id.* (citing Ex. 1006, 22:63–23:8; Ex. 1003 ¶ 206).

We are persuaded by Petitioner's contentions, the cited portions of Demos, and Dr. McDaniel's testimony that the combination of Ueno, Fetkovich, and Demos teaches the limitations recited in claim 6.

Claim 9 depends from claim 6 and further recites "maintaining counts corresponding to each of said frame types, said counts being used to determine when to use a new frame encryption key in said encrypting of said selected frames." Ex. 1001, 12:20–23.

According to Petitioner, "Fetkovich teaches updating keys based on a count of frames, with an example where the key is updated every 16 frames." Pet. 59 (citing Ex. 1005, 6:24–40 (referring to frames as pictures); Ex. 1003 ¶¶ 208–214). Petitioner contends that "Fetkovich teaches two parameters for updating keys," including "[t]he 'Key Update Unit' [which] 'refers to the unit which is to be ***tabulated*** in order to determine when the encryption key is to be updated. This unit might be one of the granularities described above (picture, slice, etc.)." *Id.* (citing Ex. 1005, 5:62–6:2). Petitioner explains that "[t]he key update frequency "refers to the data interval at which the key is to be refreshed." *Id.* (citing Ex. 1005, 6:3–6, 6:24–40).

IPR2020-00614
Patent 7,295,673 B2

Petitioner also contends that "Fetkovich further teaches that '[v]arying of the encryption parameter(s) is preferably responsive to data content' explaining that 'one trigger might be the passage of a certain number of units, where units are specific to the format in which the data is stored.'" *Id.* (citing Ex. 1005, 8:30–33). "When combined with Demos, a POSITA would have found it obvious to allow the Key Update Unit to specify not just a frame (picture), but also the type of frame, which is specific to the format in which the video stream is stored." *Id.* at 60 (citing Ex. 1003 ¶ 211). As "Demos teaches the security impact of encrypting different types of frames, including I, P, and B frames," it "teaches that the type of frame should be considered when partially encrypting video, and a POSITA would have been motivated, based on this teaching, to include the frame type ('I-frame,' 'P-frame,' or 'B-frame') for Fetkovich's Key Update Unit." *Id.* (citing Ex. 1006, 24:46–49, 23:2–7; Ex. 1003 ¶ 211).

We are persuaded by Petitioner's contentions, the cited portions of Demos, and Dr. McDaniel's testimony that the combination of Ueno, Fetkovich, and Demos teaches the limitation recited in claim 9.

Petitioner relies on the same motivation to combine as set forth for independent claim 1 (*supra* § III.A.4.b) for dependent claims 5, 6, 9, and 18, which we find persuasive and supported by sufficient rational underpinnings for the reasons set forth in Section III.A.4.c. Accordingly, we are persuaded that Petitioner establishes unpatentability of claims 5, 6, 9, and 18 over the combination of Ueno, Fetkovich, and Demos by a preponderance of the evidence.

IPR2020-00614
Patent 7,295,673 B2

### 10.    *Dependent Claims 10 and 19*

Claim 10 depends from claim 1 and further recites "wherein said synchronized frame decryption stream includes information identifying a data field size to be decrypted with respect to each encrypted frame of said protected stream." Ex. 1001, 12:24–26. Claim 19 depends from claim 14 and recites limitations substantially similar to claim 10.

Petitioner contends that "[t]he synchronized frame decryption stream includes synchronized frame decryption information, including partial encryption parameters, with respect to each encrypted frame of said protected stream."  Pet. 62–63 (citing Pet. §§ VI.A.2[1d–1g]; Ex. 1003 ¶ 216). Petitioner explains that "[t]he encryption parameters include granularity, which selects the size of the encryption unit, such as a slice or macroblock" and "Fetkovich provides an example where granularity is a slice and every fourth slice is encrypted, meaning the data field size of each encrypted portion is 1 slice." *Id.* at 63 (citing Ex. 1005, 5:28–60; 6:24–40; Ex. 1003 ¶ 217). Petitioner further contends that "Fetkovich explains that '[d]ecryption of the stream is then performed on the receiving end' 'which then decrypts the data using the encryption information'" and that Fetkovich's "encryption parameters, including granularity, are used to decrypt the encrypted MPEG video stream." *Id.* (citing Ex. 1005, 2:11–12, 6:66–7:7, Fig. 1; Ex. 1003 ¶ 218). According to Petitioner, "[t]hus the granularity parameter controls a data field size that is encrypted in each frame, and identifies a data field size to be decrypted with respect to each partially encrypted frame of said protected stream."  *Id.* (citing Ex. 1003 ¶ 219).

IPR2020-00614
Patent 7,295,673 B2

Patent Owner contends that "[i]t is undisputed that *Fetkovich*'s '
'granularity' encryption parameter identifies portions of the frame to be
decrypted (or encrypted) based on frame sub-structure," and that, "[f]or
example, the unit of encryption may be a slice."  PO Resp. 61 (citing
Ex. 1005, 5:29–33). Patent Owner further contends that "in a compressed
stream, frame substructures such as slices do not have a pre-determined or
fixed 'size.'" *Id.* Thus, according to Patent Owner, although "*Fetkovich*'s
system may specify that every fourth slice is encrypted," it "cannot specify
or convey the 'data field size' of encryption, because the size of each slice
widely varies depending on how much compression may be achieved." *Id.*
at 61–62 (citing Ex. 2008 ¶ 150).

Like Petitioner, we characterize Patent Owner's arguments as ones
that contend "data field size cannot be based on slices or macroblocks" even
though "slices and macroblocks are common 'units' of video data."  Pet.
Reply 26 (citing Pet. Reply § I.C). Petitioner contends, and we agree, that
"[t]he '673 patent expressly allows the data field size to be expressed in
terms of data 'units,' for which a byte is just one example" and as such, "the
'673 patent allows the data field size to be expressed in terms of slices and
macroblocks." *Id.* (citing Ex. 1001, 6:25–38); *supra* § II.A.  Accordingly,
we find Patent Owner's arguments to be unavailing.

We are persuaded by Petitioner's contentions, the cited portions of
Fetkovich, and Dr. McDaniel's testimony that the combination of Ueno,
Fetkovich, and Demos teaches the limitations recited in claims 10 and 19.
Petitioner relies on the same motivation to combine as set forth for
independent claim 1 (*supra* § III.A.4.b), which we find persuasive and
supported by sufficient rational underpinnings for the reasons set forth in

IPR2020-00614
Patent 7,295,673 B2

Section III.A.4.c. Accordingly, we are persuaded that Petitioner establishes

unpatentability of claims 10 and 19 over the combination of Ueno,

Fetkovich, and Demos by a preponderance of the evidence.

### 11.   Dependent Claim 13

Claim 13 depends from claim 1 and further recites

> further comprising: receiving an input stream of video content
> containing a sequence of frames; and generating the input stream
> of compressed video content by applying processing techniques
> in accordance with an applicable encoding standard to produce a
> plurality of video information streams; wherein the encrypting of
> selected frames includes encrypting a portion of a predetermined
> video information stream.

Ex. 1001, 12:37–46.

Petitioner contends that "Demos teaches receiving an input stream of

video content (e.g., captured or uncompressed video) containing a sequence

of frames." Pet. 64 (citing Ex. 1006, 2:58–60 ("Image material is preferably

captured at an initial or primary framing rate of 72fps. An MPEG-2 data

stream is then generated . . . ."), 8:15–9:18 ("MPEG-2 . . . provides an

efficient way to represent image sequences........"); Ex. 1003 ¶ 224).

Petitioner contends that "Demos teaches compressing the input stream

. . . using MPEG-2 to generate the input stream of *compressed* MPEG video

content (referenced in claim 1), by applying processing techniques in

accordance with the applicable MPEG-2 encoding standard." *Id.* at 65–66

(citing Ex. 1006, 2:58–60, 8:40–56; Ex. 1003 ¶ 226). Petitioner further

contends that Demos "teaches that the generated input stream of compressed

video content includes a plurality of MPEG-2 video information streams

(e.g., DC coefficients, AC coefficients, motion vectors)," as well as

"collecting and aggregating DC coefficients, AC coefficients, and motion

IPR2020-00614
Patent 7,295,673 B2

vectors from MPEG-2 video." *Id.* at 66 (citing Ex. 1006, 23:37–67, 24:20–40; Ex. 1003 ¶ 227).  Petitioner also contends that Fetkovich "teaches the use of MPEG video, explaining additional components of the video information streams, including macroblocks and slices," and that, thus, "for the combined teachings of the references, a POSITA would have understood DC coefficients, AC coefficients, macroblocks, and slices to be part of the plurality of video information streams produced by applying processing techniques in accordance with an applicable MPEG encoding standard." *Id.* (citing Ex. 1003 ¶¶ 229–231; Ex. 1005, 3:4–14, 5:31–33; Ex. 1006, 23:58–24:15; Ex. 1001, 10:39–43, 10:47–49).

Petitioner further contends that the "combination renders obvious encrypting DC or AC coefficients of selected frames," which "would each be a portion of a predetermined video information stream, such as the video information stream comprising quantized DCT coefficients."  *Id.* at 67 (citing Ex. 1003 ¶ 232; Pet. § VI.A.2[1d]). Petitioner contends that, alternatively, "the combination also renders obvious encrypting selected macroblocks and slices from selected frames, e.g., every other minute or important scenes." *Id.* (citing Pet. § VI.A.2[1d]). Petitioner further contends that "[t]his would have included encrypting a portion of a predetermined video information stream (e.g., selected macroblocks or slices)." *Id.* (citing Ex. 1003 ¶ 233).

We are persuaded by Petitioner's contentions, the cited portions of Fetkovich and Demos, and Dr. McDaniel's testimony that the combination of Ueno, Fetkovich, and Demos teaches the limitations recited in claim 13.

Petitioner relies on the same motivation to combine as set forth for independent claim 1 (*supra* § III.A.4.b), which we find persuasive and

IPR2020-00614
Patent 7,295,673 B2

supported by sufficient rational underpinnings for the reasons set forth in
Section III.A.4.c. Accordingly, we are persuaded that Petitioner establishes
unpatentability of claim 13 over the combination of Ueno, Fetkovich, and
Demos by a preponderance of the evidence.

### 12.   *Dependent Claim 15*

Claim 15 depends from claim 14 and further recites "wherein said
input stream and said synchronized frame decryption stream collectively
comprise a protected video stream, said synchronized frame decryption
stream being synchronized with said encrypted frames within said input
stream." Ex. 1001, 12:65–13:2.

According to Petitioner, "[t]he combination teaches or suggests
receiving as input the protected video stream from claim 1, which includes
an input stream of compressed video content and the synchronized frame
decryption stream," and that, "[i]n the protected stream, the frame
decryption information is synchronized with the set of encrypted frames into
a synchronized frame decryption stream." Pet. 79 (citing Ex. 1003 ¶¶ 258–
259; Pet. §§ VI.A.2[1b, 1e–1g], Pet. §§ VI.A.11[14a–14d]).

We are persuaded by Petitioner's contentions, the analysis and
underlying cited disclosures in Section VI of the Petition, and
Dr. McDaniel's testimony that the combination of Ueno, Fetkovich, and
Demos teaches the limitations recited in claim 15.

Petitioner relies on the same motivation to combine as set forth for
independent claim 1 (*supra* § III.A.4.b), which we find persuasive and
supported by sufficient rational underpinnings for the reasons set forth in
Section III.A.4.c.  Accordingly, we are persuaded that Petitioner establishes

IPR2020-00614
Patent 7,295,673 B2

unpatentability of claim 15 over the combination of Ueno, Fetkovich, and
Demos by a preponderance of the evidence.

### B.   Petitioner's Motion to Exclude and Motion to Strike

Petitioner timely objected to Patent Owner's evidence (Papers 23, 24,
51) and thereafter filed a Motion to Exclude Exhibits 2004–2007, 2010–
2020, and 2032. Mot. Ex. Patent Owner opposed Petitioner's Motion to
Exclude (Paper 53), and Petitioner replied to Patent Owner's Opposition
(Paper 58). Petitioner also filed a Motion to Strike Exhibit 2032 and
portions of Patent Owner's Sur-Reply (Paper 55), Patent Owner opposed
(Paper 61), and Petitioner replied to Patent Owner's Opposition (Paper 64).

### 1.   Exhibits 2004–2006, 2010, and 2020

In its Motion to Exclude, Petitioner requests exclusion of
Exhibits 2004, 2005, 2006, 2010, and 2020 for not being authenticated (Fed.
R. Evid. 901(a)), containing inadmissible hearsay (Fed. R. Evid. 801(c), 802;
37 C.F.R. § 42.53), improper opinions (Fed. R. Evid. 701, 602), and lacking
relevance (Fed. R. Evid. 402). Mot. Ex. 6–10.  Petitioner's Motion to
Exclude is dismissed as moot with respect to Exhibit 2020 because our
decision would not be affected by the admission or exclusion of that
exhibit—we do not rely on it in reaching our conclusion as to the
patentability of the challenged claims.

We are not persuaded by Petitioner's arguments and do not agree that
Exhibits 2004–2006 and 2010 are not authenticated, contain inadmissible
hearsay and improper opinions, and lack relevance. Mot. Ex. 6–10. Instead,
we find persuasive Patent Owner's arguments as to the admissibility of these
exhibits. PO Opp. Ex. 5–9. We consider Exhibits 2004–2006 and 2010 for
the limited purpose of evaluating nexus with respect to Patent Owner's

IPR2020-00614
Patent 7,295,673 B2

evidence of objective indicia of nonobviousness—which we determine is not shown (*supra* § III.A.4.e)—and afford these exhibits the appropriate weight.

As the factfinders, we are able to consider the evidence offered by Petitioner and Patent Owner, in light of the parties' arguments, and give it the appropriate weight, without risk of unfair prejudice. *See* Wright & Miller, 22A Fed. Prac. & Proc. Evid. § 5213 (2d ed.) ("In bench trials . . . appellate courts have said that exclusion of evidence on grounds of 'prejudice' makes little sense because the judge has to see the putatively prejudicial evidence in order to rule."); *see also Schultz v. Butcher*, 24 F.3d 626, 632 (4th Cir. 1994) (courts should not exclude evidence under Rule 403 in non-jury trial on grounds of unfair prejudice).

### 2. *Exhibits 2007 and 2011–2019*

Petitioner requests exclusion of Exhibits 2007 and 2011–2019 for lack of authentication (Fed. R. Evid. 901(a)), containing inadmissible hearsay (Fed. R. Evid. 801(c), 802; 37 C.F.R. § 42.53), and containing improper opinions (Fed. R. Evid. 701, 602). Mot. Ex. 10–13. We dismiss as moot Petitioner's Motion to Exclude with respect to Exhibits 2007, 2011, 2012, 2014–2016, 2018, and 2019, because we do not rely on any of these exhibits—which mostly constitute general background knowledge of encryption—in rendering our findings and conclusions in this Decision. We also note that Exhibits 2012–2014, 2016, and 2018 were published after the earliest possible priority date (October 23, 2002), and after the later filing date (July 8, 2003), of the '673 patent. And Exhibits 2012, 2013, 2016, and 2018 were published after the issuance of the '673 patent (November 13, 2007).

IPR2020-00614
Patent 7,295,673 B2

With respect to Exhibit 2017, which is "An Empirical Study of Secure MPEG Transmission," we deny Petitioner's Motion to Exclude. We are not persuaded by Petitioner's arguments and do not agree that Exhibit 2017 is not authenticated and contains inadmissible hearsay as well as improper opinions. Mot. Ex. 10–13. Instead, we find persuasive Patent Owner's arguments for the admissibility of this exhibit. PO Opp. Ex. 9–15. We consider Exhibit 2017 for the limited purpose of evaluating nexus with respect to Patent Owner's evidence of objective indicia of nonobviousness—which we determine is not shown (*supra* § III.A.4.e)—and afford this exhibit the appropriate weight, without the risk of unfair prejudice.

### 3. *Exhibit 2032 and Portions of Patent Owner's Sur-Reply*

Petitioner also requests exclusion of Exhibit 2032, an article titled "Why the DVD Hack Was a Cinch," by Andy Patrizio on Wired.com, as being impermissible new Sur-Reply evidence, as well as for being irrelevant (37 C.F.R. § 42.23(b); Fed. R. Evid. 402), not authenticated (Fed. R. Evid. 901(a)), and containing inadmissible hearsay (Fed. R. Evid. 801(c), 802).  Mot. Ex. 2–6.

Exhibit 2032 is also the subject of Petitioner's Motion to Strike. In addition to Exhibit 2032, Petitioner requests that we strike Patent Owner's "Sur-Reply [a]rguments [a]ttacking the [u]se of Ueno's [k]ey [n]umbers to [f]acilitate Demos' [f]rame [s]election."  Mot. St. 3 (emphasis omitted). Petitioner contends that arguments on pages 20 to 21 of Patent Owner's Sur-Reply constitute "unsupported, erroneous attorney argument regarding, for example, the number of bits required to identify an encrypted frame and the number of bits required for sending the key number with each frame, as well as counsel's opinions on whether something takes 'more data' and whether

IPR2020-00614
Patent 7,295,673 B2

there is 'apparent benefit.'" *Id.* at 4. Petitioner further argues that Patent Owner did not address the explanation in the Petition that, "by sending a key number with each frame, the key number can indicate the encryption key for that frame (if the frame is encrypted) or that no encryption key was used (if the frame is not encrypted)." *Id.* (citing Pet. 51, 54; Ex. 1003 ¶¶ 188, 195).

We dismiss Petitioner's Motion to Exclude as to Exhibit 2032 as moot. Similarly, we dismiss Petitioner's Motion to Strike Exhibit 2032 and portions of Patent Owner's Sur-Reply on pages 24 and 25 as moot. This is because Patent Owner's arguments concerning Exhibit 2032 are about transmitting an encryption key *with each frame* to "improve security." PO Sur-Reply 23. As discussed above in Section II.B, we do not construe "synchronized frame decryption stream" to require sending frame decryption information in a 1:1 correspondence with encrypted frames. As such, we do not consider, and need not exclude or strike, Exhibit 2032 and Patent Owner's Sur-Reply arguments that implicitly construe "synchronized frame decryption stream" in a manner which we did not adopt.

### C. *Petitioner and Patent Owner's Objections to Demonstratives*

Petitioner objects to portions of Patent Owner's oral hearing demonstratives. Paper 65. Patent Owner objects to portions of Petitioner's oral hearing demonstratives. Paper 66. As the demonstratives are not evidence, and because our Decision does not reference the demonstratives, we need not and do not address the parties' objections beyond dismissing both parties' objections as moot.

### D. *Patent Owner's Motion to Seal and Motion for Protective Order*

In its Motion to Seal, Patent Owner argues that Exhibits 2004–2006, 2010, and 2020 should sealed. *See generally* Mot. Seal. Patent Owner also

IPR2020-00614
Patent 7,295,673 B2

argues for us to grant its Unopposed Motion for Entry of Protective Order.
Mot. Prot.

According to Patent Owner, "Exhibit 2004 is a closely held document
that describes highly confidential descriptions of products of Patent Owner
DivX, LLC . . . including information relating to security measures which
Patent Owner keeps confidential for trade secret and competitive reasons."
Mot. Seal 2. Patent Owner notes that Exhibit 2004 "is designated as
HIGHLY CONFIDENTIAL PROTECTIVE ORDER MATERIAL." *Id.*
at 3. Patent Owner contends that Exhibit 2005 has the same designation and
is also "a closely held document that describes highly confidential
descriptions of DivX products including information relating to security
measures which Patent Owner keeps confidential for trade secret and
competitive reasons." *Id.* Patent Owner further contends that "Exhibit 2006
is a document marked and created as confidential directed at potential
investors, using confidential information obtained from DivX, describing
aspects of DivX's business and products" and "contain[ing] business
confidential information concerning profitability and projected growth" and
is "designated as PROTECTIVE ORDER MATERIAL." *Id.* at 3–4. Patent
Owner further contends that "Exhibit 2010 is a closely held document that
describes highly confidential descriptions of DivX products including
information relating to security measures which Patent Owner keeps
confidential for trade secret and competitive reasons" and "is designated as
HIGHLY CONFIDENTIAL PROTECTIVE ORDER MATERIAL." *Id.*
at 4. Patent Owner finally contends that "Exhibit 2020 is a claim chart
which references, cites, or otherwise utilizes confidential information
contained in Exhibit 2010 (which is designated as HIGHLY

IPR2020-00614
Patent 7,295,673 B2

CONFIDENTIAL PROTECTIVE ORDER MATERIAL" and "for the same reasons . . . that . . . Exhibit 2010 is . . . designated as described above, Exhibit 2020 is [also] designated as HIGHLY CONFIDENTIAL PROTECTIVE ORDER MATERIAL." *Id.*

Petitioner contends that Patent Owner does not show good cause for sealing the Exhibits discussed above because Patent Owner does not identify the specific information it believed to be confidential, does not explain what harm would result from public disclosure of the information, does not explain a genuine need to rely in the trial on the specific information sought to be sealed, and does not show an interest in maintaining confidentiality outweighs the strong public interest in having an open record.  Pet. Opp. Mot. Seal 5, 9, 11, 12. Petitioner further contends that designating the exhibits (as confidential) in the District Court does not bind the Board's Decision in this case.  *Id.* at 13.

We are not persuaded by Petitioner's arguments and are, instead, persuaded by Patent Owner's contentions that the Board routinely seals information relating to a party's products and financial information and that the balance of factors favors the limited sealing request.  PO Reply Mot. Seal 2, 4; *see also* Mot. Seal (Patent Owner arguing reasons to seal Exhibits 2004–2006, 2010, and 2020).  As such, we grant Patent Owner's Motion to Seal in its entirety and also grant Patent Owner's Motion for Entry of Protective Order.  Mot. Seal; Mot. Prot.

IV.   PATENT OWNER'S CONSTITUTIONALITY ARGUMENTS

Patent Owner contends that "[t]he Board's organization, including its incentive and fee structure, violates the due process and Administrative Procedure Act right to an impartial, disinterested tribunal, *see, e.g.*, *Ward v.*

IPR2020-00614
Patent 7,295,673 B2

*Vill. Of Monroeville*, 409 U.S. 57 (1972), by improperly encouraging

decisions in favor of institution, including this one." PO Resp. 62.

Patent Owner contends that "[t]he PTAB business unit keeps more (*i.e.*, pre-

paid post-institution) IPR fees (which fund nearly half its AI[A] trial

budget), and the assigned Board panel grants itself more work and greater

opportunity for work 'production' and performance review credits, each

time the panel grants rather than denies institution on the Director's behalf."

*Id.* According to Patent Owner,

> [t]he Board thus enjoys both pecuniary and employment benefits
> from granting institution. The line APJs' lack of Title 5 job
> protections and independence under *Arthrex, Inc. v. Smith &
> Nephew, Inc.*, 941 F.3d 1320 (Fed. Cir. 2019), *reh'g denied*, 953
> F.3d 760 (Fed. Cir. 2020) (en banc), *cert. granted*, *Smith &
> Nephew, Inc. v. Arthrex, Inc.*, 2020 U.S. Lexis 4928 (S. Ct. Oct.
> 13, 2020), and the Lead ALJs' mixture of administrative and
> adjudicative functions, add the further appearance of bias.
> Although the Board has declined to adjudicate its procedures'
> constitutionality, *e.g.*, *ZTE (USA) v. Fundamental Innovation
> Sys. Int'l*, IPR2018-00425, Paper 52, 29 (PTAB Jul. 2, 2019), and
> cannot change, waive or cure the organizational features
> described above, the appropriate remedy is dismissal.

*Id.* at 62–63.

Patent Owner further contends that "the Board is unconstitutionally

appointed to decide IPRs" and that "[e]liminating Board tenure protections

cannot cure that problem." *Id.* at 63 (citing *Arthrex*, *pet. for cert. filed*, 19-

1458 (June 30, 2020)). Patent Owner takes the position that, "[e]ven if a

cure were possible without Congressional confirmation or higher agency

review, it cannot be done by 'retroactively' 'severing' long-guarded

protections in a long-standing, different statute." *Id.*

IPR2020-00614
Patent 7,295,673 B2

Additionally, Patent Owner contends that, "[b]ecause Patent Owner is
not before the Board by choice, and no properly-appointed Board panel is
available, the appropriate remedy is not severance, but dismissal." *Id.*

Patent Owner raises two Constitutional arguments relating to the
Board's ability to render a decision in this proceeding including: (1) that the
Board's organization, including its incentive and fee structure, violates due
process and the right to an impartial, disinterested tribunal; and (2) that the
Board was unconstitutionally appointed. *Id.* at 62–63.  We decline to
address Patent Owner's constitutional challenge except to note that the
constitutionality of the appointments of the Administrative Patent Judges
was addressed by the U.S. Supreme Court in *United States v. Arthrex, Inc.*,
141 S. Ct. 1970, 1986–87, 1997 (2021).

## V.   CONCLUSION

For the foregoing reasons, we conclude that Petitioner has established
unpatentability of claims 1–6, 9, 10, and 13–19 by a preponderance of the
evidence.[8] Our conclusion regarding the challenged claims is also presented
below:

---

[8] Should Patent Owner wish to pursue amendment of the challenged claims
in a reissue or reexamination proceeding subsequent to the issuance of this
decision, we draw Patent Owner's attention to the April 2019 *Notice
Regarding Options for Amendments by Patent Owner Through Reissue or
Reexamination During a Pending AIA Trial Proceeding. See* 84 Fed. Reg.
16,654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application
or a request for reexamination of the challenged patent, we remind Patent
Owner of its continuing obligation to notify the Board of any such related
matters in updated mandatory notices.  *See* 37 C.F.R. §§ 42.8(a)(3), (b)(2).

IPR2020-00614
Patent 7,295,673 B2

| Claim(s) Challenged | 35 U.S.C. § | Reference(s)/Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1–6, 9, 10, 13–19 | 103 | Fetkovich, Demos, Ueno | 1–6, 9, 10, 13–19 | |

## VI. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that claims 1–6, 9, 10, and 13–19 of the '673 patent are determined to be unpatentable;

FURTHER ORDERED that Petitioner's Motion to Exclude is dismissed as moot with respect to Exhibits 2020, 2007, 2011–2016, 2018, and 2032, and denied with respect to Exhibits 2004–2006, 2010, and 2017;

FURTHER ORDERED that Petitioner's Motion to Strike is dismissed as moot;

FURTHER ORDERED that Patent Owner's Motion for Entry of Protective Order is granted;

FURTHER ORDERED that Patent Owner's Motion to Seal is granted in its entirety and Exhibits 2004-2006, 2010, and 2020 and this Decision are to be sealed;

FURTHER ORDERED that the parties shall jointly submit to the Board a proposed redacted version of the Final Written Decision (Paper 68) within 14 days of this Decision;

FURTHER ORDERED that Patent Owner's and Petitioner's Objections to Demonstratives are each dismissed as moot; and

IPR2020-00614
Patent 7,295,673 B2

FURTHER ORDERED that, because this a Final Written Decision, parties to this proceeding seeking judicial review of this Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2020-00614
Patent 7,295,673 B2

For PETITIONER:

Harper  Batts
Chris  Ponder
Jeffrey Liang
SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP
hbatts@sheppardmullin.com
cponder@sheppardmullin.com
jliang@sheppardmullin.com


For PATENT OWNER:

Kenneth Weatherwax
Nathan Lowenstein
Bridget Smith
Flavio Rose
Edward Hsieh
Parham Hendifar
Patrick Maloney
LOWENSTEIN & WEATHERWAX LLP
weatherwax@lowensteinweatherwax.com
lowenstein@lowensteinweatherwax.com
smith@lowensteinweatherwax.com
rose@lowensteinweatherwax.com
hsieh@lowensteinweatherwax.com
hendifar@lowensteinweatherwax.com
maloney@lowensteinweatherwax.com